The PEOPLE of the State of Colorado, Plaintiff–Appellant,

v.

Carlos Christopher GALVADON, Defendant–Appellee.

No. 04SA166.

Supreme Court of Colorado, En Banc.

Jan. 10, 2005.

Jeanne M. Smith, District Attorney, Nan Scranton, Deputy District Attorney, Doyle Baker, Deputy District Attorney, Colorado Springs, for Plaintiff–Appellant.

Dennis W. Hartley, P.C., Dennis W. Hartley, Colorado Springs, for Defendant–Appellee.

MARTINEZ, Justice.

The sole issue before this court, in this case is the preliminary question of whether the defendant is entitled to protection of the Fourth Amendment of the U.S. Constitution. The central inquiry in determining whether the Fourth Amendment protects the defendant is whether the defendant had a reasonable expectation of privacy from government intrusion in the area searched. If the defendant here, Carlos Galvadon (Galvadon), can demonstrate a reasonable expectation of privacy in the place searched, the search of the area thus protected by the Fourth Amendment must be reasonable and pursuant to a warrant or within an exception to the warrant requirement.

This interlocutory appeal is brought by the prosecution pursuant to section 16–12–102(2), 6 C.R.S. (2003) and C.A.R. 4.1 from an order of the El Paso District Court granting Galvadon's motion to suppress evidence discovered as a result of a search of the back room of a store where Galvadon was employed. In this case, we determine whether Galvadon, as night manager of the store, has a legitimate expectation of privacy from government intrusion in the back room of the store such that he is entitled to protection by the Fourth Amendment of the U.S. Constitution, when the room is accessible to delivery persons and subject to the store's video surveillance system. Based on the factual findings of the trial court and uncontested evidence adduced at the suppression hearing, we hold that Galvadon did have a reasonable expectation of privacy from government intrusion in the back room of the store.

The facts of this case present an unusual set of circumstances where a police officer investigating suspicious activity followed two individuals into the back room of the store where Galvadon worked. Subsequent officers were called to the scene to assist in the investigation and, while standing in the back room, discovered bricks of marihuana sitting in plain view.

■ The prosecution has only appealed the issue of Galvadon's "standing" to assert Fourth Amendment protection. We note, however, the U.S. Supreme Court distinguishes between general concepts of judicial standing and "standing" in the Fourth Amendment context. See *Minnesota v. Carter*, 525 U.S. 83, 87, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998); *Rakas v. Illinois*, 439 U.S. 128, 128–29, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). The general concept of standing asks whether a person is asserting his own rights, not those of a third person, and the person has alleged injury in fact. *Rakas*, 439 U.S. at 128–29, 99 S.Ct. 421. The Fourth Amendment inquiry is a more complex inquiry to determine whether the "disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." *Id.* If such an interest was infringed, the defendant may claim protection of the Fourth Amendment.

*Id.* To be clear, in this case, we address "standing" in the Fourth Amendment context and determine whether the search of the back room of the liquor store infringed on any of Galvadon's interests the Fourth Amendment was designed to protect.

Such an inquiry does not permit this court to venture into the possible justifications or reasonableness of the police entering the back room. Our review, therefore, is limited to the preliminary Fourth Amendment issue and does not proceed to address the reasonableness of the search or the various Fourth Amendment exceptions relevant to government searches which may make the search of a protected area permissible.

## I. Facts and Proceedings Below

Galvadon worked as the night manager of a liquor store owned by his mother-in-law. Galvadon and his mother-in-law were the only employees of the store.

The store is located in a strip shopping center and occupies a narrow rectangular retail space. The front two-thirds of the retail space make up the publicly accessible portion of the store. The back of the store, however, is separated from the front of the store by a large refrigerator to create a separate room ("back room") used for inventory storage, an office and a bathroom. The only access to the back room from the front of the store is through a narrow corridor between the wall of the store and the refrigerator.

The front of the store consists of large glass windows and a glass-paned door with a checkout counter in front. The store has four surveillance video cameras. One is located in the back room and three others are located throughout the front of the store. The video recorder and monitor are also located in the back room.

As night manager, Galvadon was left by himself to take care of the store. His responsibilities included ordering liquor, making bank deposits, writing checks for the store, and restocking shelves. Galvadon used the back room to conduct all of these activities. According to Galvadon, the only people who had unrestricted access to the

back room were himself and the owner. Delivery persons were regularly permitted in the back room, but only if supervised or otherwise granted access.

On November 20, 2003, Galvadon was working at the liquor store as night manager. Two other people, Jeffery Hogan (Hogan) and David Flores (Flores), were at the store with him for about an hour. Although the record is not clear as to what exactly transpired, the parties recite the same sequence of events: Shortly before midnight, Flores and Hogan were outside of the store standing in the parking lot. Galvadon stood in the open doorway at the front of the store. Flores was sprayed in the face with pepper spray.[1]

At the same time, or immediately thereafter, Sergeant Juhl of the Colorado Springs Police Department ("Sergeant Juhl") drove by the store. Sergeant Juhl became suspicious when he saw Flores drop to the ground. He called for backup officers, turned around, and pulled into the parking lot.

When Sergeant Juhl arrived, Galvadon was inside the store, but Hogan and Flores were still in the parking lot. Hogan explained that he and Flores had been "assaulted" by someone around the corner and that Flores was sprayed with pepper spray. Hogan explained that he wanted to take Flores to get his face washed off and then began to escort Flores into the store. Sergeant Juhl followed them.

Once in the store, Hogan asked if he and Flores could use the bathroom. Galvadon stated that no one was allowed in the back. Hogan urged Galvadon that Flores was in pain and needed to use the bathroom to wash off his face. Galvadon again insisted, several times, that no one was allowed in the back room. Hogan, however, ignored Galvadon and escorted Flores to the back room. Sergeant Juhl followed them. Galvadon followed all three of them into the back room.

While Flores was washing his face, backup officers arrived and went to the back room.

Galvadon again told everyone in the back room that no one was allowed in back. Galvadon then returned to the front of the store. The officers stayed in the back room with Flores and Hogan while Sergeant Juhl went to the front of the store to speak with Galvadon. While in the back room, one of the officers discovered a "brick" of marihuana sitting in the bottom of an open cardboard box. Shortly thereafter, another brick was discovered sitting in a bag on the floor of the bathroom. Later, the owner of the store arrived and consented to a search of the store. During the search a third brick of marihuana was discovered in the back room.

After Flores, Hogan and the officers cleared out of the back room, Galvadon went into the back room by himself. Sergeant Juhl followed him. When Sergeant Juhl reached Galvadon, he discovered him attempting to hide a surveillance video tape in his pants. Galvadon explained that he had been drinking in the store earlier that night and was hiding the tape because he did not want the owner to find out. The video was later viewed by the investigating officers and showed Galvadon placing what the officers believed to be the bricks of marihuana in the back room.

Galvadon was subsequently charged with possession of marihuana, possession with intent to distribute marihuana and assault in the third degree.

Prior to trial, Galvadon sought to suppress the evidence seized from the liquor store as the fruit of an illegal search. In response, the prosecution argued that Galvadon did not have "standing" to challenge the police intrusion because he had no expectation of privacy in the back room of the store. More specifically, the prosecution claimed that because Galvadon was only an employee he could have no reasonable expectation of privacy. In addition, the prosecution asserted that because others had access to the back room and Galvadon was aware he was being videotaped by the in-store surveillance system

---

1. As part of the complaint against Galvadon, the prosecution charged him with assault, alleging that he was responsible for spraying Flores. Testimony at the suppression hearing was limited to the Fourth Amendment issues raised the Galvadon and the court did not permit testimony about the cause of or Galvadon's knowledge about Flores being sprayed.

while in the back room, that Galvadon could not have a reasonable expectation of privacy. The trial court disagreed and found that Galvadon had "standing" to assert Fourth Amendment protection on the basis of his reasonable expectation of privacy in the back room.

The trial court went on to rule that the warrantless intrusion into the back room could not be justified by any of the exceptions at law argued by the prosecution. Specifically, the court found there were no exigent circumstances, the intrusion was not based on emergency aid and Galvadon did not give consent. These rulings were not appealed by the prosecution and therefore we do not address them here. Instead, the prosecution only appeals the trial court's ruling that Galvadon had Fourth Amendment "standing."

## II. Analysis

 On appeal we only address whether Galvadon was protected by the Fourth Amendment from unreasonable government intrusion on the basis of his reasonable expectation of privacy in the back room. We do not review the trial court's other rulings.

 As a preliminary matter, we point out that the analysis in this case is limited to Galvadon's ability to claim protection under the Fourth Amendment of the U.S. Constitution. Galvadon contends that both the Fourth Amendment of the U.S. Constitution and article II, section 7 of the Colorado Constitution protect him from government intrusion in the back room of the store. In interpreting article II, section 7 of the Colorado Constitution, this court has historically relied upon a broader definition of what constitutes a legitimate expectation of privacy from government intrusion than that of its federal counterpart, the Fourth Amendment.[2] *See, e.g., People v. Oates,* 698 P.2d 811, 815–16 (Colo.1985). Here, however, the Fourth Amendment jurisprudence of this court and the U.S. Supreme Court sufficient-

ly provide for Galvadon's legitimate expectation of privacy under the circumstances of this case. Therefore, we need only analyze the facts of this case under the federal constitution in reaching our conclusion and need not determine if the state constitution affords any greater protection.

The prosecution argues that because Galvadon was aware that delivery persons had access to the back room and the back room was under in-store surveillance, any activities that occurred in the back room were "knowingly exposed" to Galvadon's employer and the public. As such, the prosecution contends Galvadon could not have had a reasonable expectation of privacy in the back room. We disagree.

Galvadon was the night manager and the sole person in control of the store. He used the back room to conduct the business of the store and maintained the right to exclude public access to the back room. In addition, there is no evidence that the surveillance system was reviewable by the government or public. Other than Galvadon, the surveillance video was only reviewable by the owner of the store and that alone did not diminish Galvadon's reasonable expectation of privacy from government intrusion. For these reasons, we find that Galvadon maintained a reasonable expectation of privacy in the back room of the liquor store such that he is entitled to Fourth Amendment protection from government intrusion. We therefore affirm the trial court.

 In reviewing the district court's refusal to grant a suppression motion, we accept the district court's findings of fact absent clear error and review de novo the district court's determination of reasonable expectation of privacy under the Fourth Amendment. *People v. Miller,* 75 P.3d 1108, 1111–12 (Colo.2003). To claim protection of the Fourth Amendment, a defendant has the burden of demonstrating that he is entitled

---

**2.** Colo. Const., article II, section 7 provides:
The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures; and no warrant to search any place or seize any person or things

shall issue without describing the place to be searched, or the person or thing to be seized, as near as may be, nor without probable cause, supported by oath or affirmation reduced to writing.

to protection. *People v. Juarez,* 770 P.2d 1286, 1289 (Colo.1989).

We begin our analysis with a review of the U.S. Supreme Court's creation and application of the expectation of privacy test. We discuss the Court's jurisprudence on raising Fourth Amendment protection beyond the home and determine that an employee may claim Fourth Amendment protection if the employee maintained a reasonable expectation of privacy from government intrusion. We recognize that under limited circumstances, persons employed in the liquor industry may have a diminished expectation of privacy, but in this case, Galvadon's expectation of privacy is not diminished. We determine that based on Galvadon's rights and responsibilities as night manager and his exclusive control over the back room of the store, that Galvadon maintained a reasonable expectation of privacy from government intrusion. We also determine that the in-store surveillance camera, viewable only by Galvadon and the owner of the store, had no effect on this expectation. We conclude that Galvadon is entitled to assert Fourth Amendment protection.

### A.

■ The Fourth Amendment to the U.S. Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." It is fundamental "that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *Alderman v. United States,* 394 U.S. 165, 171–72, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

■ In *Katz v. United States,* 389 U.S. 347, 352–53, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the U.S. Supreme Court delineated the parameters of Fourth Amendment protection. Prior to *Katz,* the Court struggled with a method of determining when a person is afforded Fourth Amendment protection. *Katz,* 389 U.S. at 352–53, 88 S.Ct. 507. Protection at the time was generally based on traditional notions of property law, where one must have a property interest in the place or thing searched. *Id.* Such an inquiry focused on the place or thing searched, rather than the person asserting protection. *Id.* The Court in *Katz* rejected this idea because it lost sight of what the Fourth Amendment actually protected. *Id.* The Court held that the Fourth Amendment protects people and their privacy from government intrusion, not simply places based upon a person's property interests or their right to be in that place. *Id.* at 353, 88 S.Ct. 507. Because the Fourth Amendment protects a person's privacy from government intrusion, the Court determined that the proper inquiry should focus on the reasonably justified privacy expectations of the defendant as they relate to the place searched rather than the direct legal relationship between the place or property searched and the defendant. *Id.*

■ Based upon privacy expectations set forth in *Katz,* the U.S. Supreme Court found that protection afforded by the Fourth Amendment is not limited to a literal reading of "houses," but instead extends beyond the home and may be asserted in the workplace. *Mancusi v. DeForte,* 392 U.S. 364, 367–68, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968). Specifically, the U.S. Supreme Court found that an employee has standing to object to the search of his office as well as his home. *Id.* In *Mancusi,* the defendant was a union official charged with misusing his office for coercion, extortion, and conspiracy. *Id.* at 365, 88 S.Ct. 2120. The defendant shared an office with several other union officials. *Id.* When the defendant refused to comply with a subpoena to produce union records, the state officials that served the subpoena searched the office and seized various records without a warrant. *Id.* The defendant was present for the search and objected to it. *Id.* The papers seized did not belong to the defendant. *Id.* at 367, 88 S.Ct. 2120.

The Court applied the expectation of privacy analysis established in *Katz* to hold in *Mancusi* that the defendant could object to the search on Fourth Amendment grounds. *Id.* at 368, 88 S.Ct. 2120. Specifically, the Court found that Fourth Amendment protection applied in the workplace if the defendant

had a "reasonable expectation of freedom from governmental intrusion" in the area invaded. *Id.* While the physical characteristics of the area were important, the overriding consideration was the defendant's privacy expectation in that area. *Id.* at 369, 88 S.Ct. 2120. The Court found that despite sharing the office with several others, the defendant maintained a reasonable expectation of privacy from government intrusion in the office. *Id.* The Court discussed that the defendant would clearly hold such an expectation if the office were private and the records were seized from a desk or filing cabinet, and went on to find that sharing the office did not "fundamentally" change the defendant's expectation of privacy. *Id.* Specifically, the defendant could "reasonably have expected that only those persons and their personal or business guests would enter the office, and the records would not be touched except with their permission or that of union higher ups." *Id.*

Since the decisions in *Katz* and *Mancusi,* the Court has made clear that the reasonable expectation test is the best way to protect a person's privacy interests from government intrusion as afforded by the Fourth Amendment. *Rakas,* 439 U.S. at 143, 99 S.Ct. 421; *see also People v. Curtis,* 959 P.2d 434, 437 (Colo.1998); *People v. Schafer,* 946 P.2d 938, 941–42 (Colo.1997). Although the test does not provide "law enforcement officials with a bright line between the protected and unprotected," the test remains "faithful to Fourth Amendment purposes." *Rakas,* 439 U.S. at 156, 99 S.Ct. 421 (Powell, J., concurring).

■ To determine if an expectation of privacy is reasonable, a defendant must have an actual expectation that the area or activity subjected to governmental intrusion would remain free of such intrusion and such an expectation must be one that "society is pre-

pared to recognize as reasonable." *Oates,* 698 P.2d at 814; *see also Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979).

■ Where the government search at issue takes place in a highly regulated industry such as the liquor business, under certain circumstances proprietors of such businesses might have a diminished expectation of privacy because of long-standing government oversight and consequently have less Fourth Amendment protection.[3] *See, e.g., Barlow's, Inc.,* 436 U.S. at 312–13, 98 S.Ct. 1816. The expectation of privacy in the liquor industry, however, is only diminished to the extent that searches are specifically authorized pursuant to constitutional administrative inspection regulations and conducted pursuant to the purpose of the regulatory scheme. *See Colonnade,* 397 U.S. at 77, 90 S.Ct. 774 (specifically found that a search of a business in the liquor industry exceeded the scope of statutory authority, despite the Court's recognition that the industry has been "long subject to close supervision and inspection"); *United States v. Biswell,* 406 U.S. 311, 317, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (limiting its holding so that administrative inspections of closely regulated businesses such as the gun industry may only proceed without a warrant where specifically authorized by statute); *see also United States v. Chuang,* 897 F.2d 646, 650 (1990) (reasonable expectation of privacy "is attenuated to the point where any warrantless examination of [the defendant's] office pursuant to a regulatory scheme may be reasonable within the meaning of the Fourth Amendment"). Where, as here, the search of the liquor store was investigatory in nature and not an administrative search conducted pursuant to any regulation or statute, the defendant maintains his otherwise reasonable expectation of privacy.[4]

---

3. The U.S. Supreme Court has limited its discussion of the constitutionality of warrantless searches in this context as an exception to the warrant requirement. *See, e.g., Marshall v. Barlow's, Inc.,* 436 U.S. 307, 313, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978); *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 76–77, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970). In its discussion, the court took notice of the pervasive regulation in the industry as one factor in justifying warrantless administrative inspections, *see id.,* but the

Court has not extended this warrant exception to hold that protection for those operating or employed within pervasively regulated businesses are wholly without Fourth Amendment protection. Neither party in this case has argued that this doctrine should be extended to preclude Fourth Amendment protection in the liquor industry.

4. This court has previously rejected a broad reading of Colorado's Liquor Code and found

Judicial review of Fourth Amendment standing is made on a case-by-case basis, *O'Connor v. Ortega,* 480 U.S. 709, 718, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987), looking to the totality of circumstances to determine if the defendant maintained a reasonable expectation of privacy in the place searched. *Schafer,* 946 P.2d at 941; *People v. Savage,* 630 P.2d 1070, 1073 (Colo.1981).

In examining the circumstances of a particular case, courts have chosen to focus on different factors. Some courts look to the "nexus" between the area searched and the work space of the defendant. *See, e.g., United States v. Mohney,* 949 F.2d 1397, 1403–04 (6th Cir.1991); *United States v. Britt,* 508 F.2d 1052 (5th Cir.1975). Other courts have looked to a defendant's right to exclude others from accessing the area for which the defendant asserts privacy. *See, e.g., Rawlings v. Kentucky,* 448 U.S. 98, 105, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) (defendant had no standing to object to search of a purse belonging to another where defendant lacked the right to exclude others). Regardless of the factors considered, an "employee's expectation of privacy must be assessed in the context of the employment relation." *O'Connor,* 480 U.S. at 717, 107 S.Ct. 1492.

We now turn to the question of whether Galvadon had a reasonable expectation of privacy from government intrusion in the back room. A search of this and other jurisdictions' case law reveals very few cases discussing the use of employer surveillance as a factor in determining an employee's reasonable expectation of privacy from government intrusion. Given the lack of case law addressing the impact of such surveillance systems, we find it best to first consider in Part B, *infra,* whether Galvadon's expectation of privacy against government intrusion would exist absent the in-store surveillance system. Because we find Galvadon would have had an expectation of privacy without the video surveillance, we then discuss in Part C, *infra,*

the effect the surveillance camera has on this expectation.

## B.

We look to several factors to determine whether Galvadon's expectation of privacy against government intrusion would exist absent the in-store surveillance system. First, we look to the physical characteristics and actual use of the back room and determine that the room was not publicly accessible and was used by Galvadon to conduct the business affairs of the store. Next, we look to Galvadon's authority as night manager and determine that he had control over the store such that he maintained the power to exclude the public from the back room. In addition, delivery persons' limited access to the back room was within the control of Galvadon. We conclude, based upon these factors, that Galvadon maintained a reasonable expectation of privacy from government intrusion without the video surveillance.

First, the back room of the liquor store is an exclusive area reserved for use by the owner and Galvadon. Its physical separation from the rest of the store indicates that public access is restricted in this area. The testimony of Sergeant Juhl indicates that even he assumed upon his first entry to the store that the public was not allowed in the back room. The room was specifically set apart as a private place for the owner and Galvadon to conduct the business affairs for the store shielded from the view and access of the public.

Second, Galvadon had the power to exclude access to the back room. As the night manager, and at the time of the police intrusion in this case, Galvadon was in charge and the only person in the store that controlled access to the back room. Because this incident occurred near midnight and Galvadon was left alone by the owner to manage the store, Galvadon could reasonably expect that only persons to whom he granted permission

---

that the State cannot regulate the liquor industry to the extent of eliminating Fourth Amendment protection and circumventing the warrant requirement. *See People v. Alexander,* 193 Colo. 27, 29, 561 P.2d 1263, 1265 (1977). Any attempt to broadly interpret Colorado's Liquor Code to

authorize warrantless investigatory searches under the circumstances of this case, especially where the search was not conducted as an inspection pursuant to the Code, would require this court to overrule its previous decision.

would be given access to the back room. Furthermore, Galvadon attempted several times to keep out Sergeant Juhl, Flores, and Hogan, as well as the emergency medical technicians and other officers that arrived at the liquor store. This is a clear manifestation of Galvadon's belief that he could control access to the back room and maintain an expectation of privacy from intrusion of others into that area.

Despite the prosecution's argument to the contrary, the fact that the back room was accessible by a limited number of people does not eliminate Galvadon's expectation of privacy. Galvadon testified that there was a store policy that no one other than himself and the owner were permitted in the back room. Exceptions were made for delivery persons; however, Galvadon's expectation of privacy was not diminished simply because the space was occasionally accessed by someone else.

Galvadon was in a position much like the defendant in *Mancusi*. 392 U.S. at 365, 88 S.Ct. 2120. The defendant in *Mancusi* shared his office with several others, *id.*, but the court found that the defendant could "reasonably have expected that only those persons and their personal or business guests would enter the office, and the [evidence seized] would not be touched except with their permission or that of [ ] higher ups." *Id.* at 369, 88 S.Ct. 2120. Such an expectation, according to the Court, did not eliminate his expectation of privacy from government intrusion. *Id.* Here, based on the no-access policy, Galvadon could reasonably have expected that only persons permitted in the back room would be the owner, himself, or either of their guests. Access could only be granted at the instance of Galvadon or the owner, whoever was present. With respect to delivery persons, such access was only granted for the limited purpose of delivering beer and liquor, a circumstance necessary for the continued operation of the liquor store. Because Galvadon, as night manager and sole

person operating the store, could control the access of delivery persons, such access has no effect on Galvadon's reasonable expectation of privacy from government intrusion.

We find that it was reasonable, without considering the effect of the surveillance system, for Galvadon to expect privacy from the government intrusion in the back room of the liquor store—an expectation, based on the foregoing circumstances, we believe "society is prepared to recognize as reasonable."

## C.

Having found that Galvadon could maintain an expectation of privacy in absence of the in-store surveillance system, we now turn to the question of whether his expectation of privacy from government intrusion was diminished by the presence of the surveillance system.

The surveillance system consists of four video cameras; one was located in the back room.[5] The video monitor and tape machine were also located in the back room. The prosecution generally asserts that because Galvadon was aware that the back room was under in-store surveillance, any activities that occurred in the back room were "knowingly exposed" to the store owner and the public. The prosecution further claims that Galvadon made an "informed choice to expose his criminal conduct to the scrutiny of others . . . ." This general assertion, however, ignores the fundamental inquiry supporting Fourth Amendment standing—whether the defendant has a reasonable expectation of privacy *from government intrusion*.

To be faithful to the purpose of the Fourth Amendment, we must carefully examine from whom the defendant in this case had a reasonable expectation of privacy, if any, given the presence of the surveillance camera. In doing so, we must examine how activities exposed to the public and Galvadon's employer affect Galvadon's reasonable expectation

---

**5.** Despite the prosecution's argument at the suppression hearing, the district court order did not make any factual finding with respect to the surveillance system and did not address the system in determining the defendant's reasonable expectation of privacy. The facts cited here are taken from uncontested portions of the record.

In addition, the record is void of detailed facts about the purpose and use of the system. The record did include an edited portion of the surveillance video tape from the night in question. The tape revealed a low resolution video that made it difficult to identify faces and small objects.

of privacy from government intrusion. We look first to determine if Galvadon was exposed to the public and whether such exposure diminished his expectation of privacy from government intrusion. Here, however, we find that Galvadon's activities were not exposed to the public through the surveillance system. Next, we consider if Galvadon's activities were open to the scrutiny of the store owner and, if so, whether he could still maintain a reasonable expectation of privacy from government intrusion. We find that although the in-store surveillance video camera might have diminished Galvadon's expectation of privacy from the owner of the store, the surveillance system does not diminish his expectation of privacy from government intrusion. We conclude that under the totality of the circumstances, Galvadon maintained a reasonable expectation of privacy from government intrusion in the back room of the store such that he may assert protection of the Fourth Amendment.

It is clear that "what a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz*, 389 U.S. at 351, 88 S.Ct. 507. Here, however, the record does not does not support the conclusion that the surveillance camera exposed Galvadon to the public, thus eliminating any reasonable expectation of privacy from government intrusion. Instead, there is no indication that any monitors were viewable from the publicly accessible portions of the store or that the public had access to the video recordings under the normal operation of the store. The owner and Galvadon were the only store employees, the only persons with access to the back room, and thus the only persons with access to the video recording and video monitor located there. The public, under these circumstances, did not have access to view the surveillance monitor or the video recording. As such, we find no support for the proposition that the in-store surveillance system "exposed" Galvadon to the public.

We next consider if the surveillance system exposed Galvadon's activities in the back room to the store owner and, if so, whether the exposure eliminates Galvadon's expectation of privacy from government intrusion.

The parties do not dispute that the surveillance system exposed Galvadon's activities in the back room to the owner of the store. As such, we proceed with the analysis to determine if such exposure to the store owner eliminated Galvadon's reasonable expectation of privacy from government intrusion.

■ The U.S. Supreme Court has found that defendant-employees may have little or no expectation of privacy from their employer, but may still maintain a reasonable expectation of privacy from government intrusion. In *Mancusi*, the defendant shared his office with several others. 392 U.S. at 368, 88 S.Ct. 2120. The Court found that this factor alone was insufficient to extinguish the defendant's expectation of privacy from government intrusion. *Id.* The Court held that despite the anticipation of intrusions by his co-workers and supervisors, these intrusions did not diminish the defendant's expectation of privacy from government intrusion. *Id.* at 369, 88 S.Ct. 2120. The Court specifically found that where a defendant could reasonably expect that work-related intrusions into his privacy would be limited to guests and invitees of himself and his supervisors, the defendant could still maintain a reasonable expectation that his privacy would not be "defeated" by government officials. *Id.; see also O'Connor*, 480 U.S. at 717, 107 S.Ct. 1492 (specifically recognizing that the defendant-employee in *Mancusi* had a reasonable expectation of privacy from government intrusion, but did not maintain such an expectation from his supervisor).

Similarly, we can assume here that because of the surveillance system, Galvadon had a diminished expectation of privacy from the owner of the store. Although the record is void of any reference to how often, if at all, the owner reviewed the surveillance tapes, such evidence would only demonstrate Galvadon's diminished expectation of privacy from the store owner. This, however, does not indicate that he had no reasonable expectation of privacy from government intrusion.

There is little case law from other jurisdictions where courts have determined whether a defendant can maintain an expectation of privacy when a defendant is subject to open and visible surveillance system operated by

his employer;[6] one case, *Bevan v. Smartt*, 316 F.Supp.2d 1153 (D.Utah 2004), does address such a situation. We find this case persuasive as another court distinguishing between a reasonable expectation of privacy from an employer and a reasonable expectation of privacy from government intrusion.[7]

In *Bevan*, the federal court found that a night club dancer had a reasonable expectation of privacy from government intrusion in the club's dressing room despite evidence that other dancers regularly used the room, other employees occasionally entered the room, the room was used for activities other than changing clothes and the room was monitored by an open and disclosed surveillance system viewable by the club management. 316 F.Supp.2d at 1160–61. With respect to the video surveillance, the court found that the video monitors were regularly watched by only the club's disc jockey in the disc jockey booth and the club manager in his office. *Id.* at 1160. Because the surveillance was viewable only by the disc jockey and the manager, the court found that the dancer did not have an expectation of privacy from the club's management or disc jockey. *Id.* at 1160–61. Such a finding, however, did not affect the defendant's reasonable expectation of privacy from police intrusion. *Id.* at 1161. The court specifically rejected the idea that the dancer could have no reasonable expectation of privacy from government intrusion simply because the activities of the dancer were visible to others via the surveillance camera. *Id.*

Like the court in *Bevan*, we similarly reject the argument presented here by the prosecution. The surveillance system in this case was viewable only by Galvadon and the owner of the store. The simple fact that Galvadon's activities were being recorded via the surveillance system is not enough to demonstrate he had no reasonable expectation of privacy from government intrusion. There is no evidence that the surveillance system was reviewable by the government or government officials.

As in *Bevan*, we also reject the idea that simply because the owner could view defendant's conduct via the surveillance system, Galvadon had a diminished expectation of privacy from government intrusion. If anything, Galvadon, as night manager, had access and control of the surveillance system which afforded him a greater expectation of privacy than that of the dancer in *Bevan*. Contrary to the assertions by the prosecution, we find the existence of the surveillance system viewable only to Galvadon and the owner of the store insufficient to terminate Galvadon's reasonable expectation of privacy from government intrusion.

## III. Conclusion

We conclude under the totality of circumstances that the sole person in control of the store, the night manager, maintained a reasonable expectation of privacy from government intrusion in the back room of the store, an area without public access, such that he may assert protection of the Fourth Amendment. The use of a surveillance system reviewable only by the night manager and the owner of the store did not diminish his reasonable expectation of privacy from government intrusion. For these reasons, we conclude that Galvadon is entitled to the protections of the Fourth Amendment.

---

**6.** There are several cases, however, where the parties challenge the use of surveillance equipment as a breach of a pre-existing expectation of privacy. *See, e.g., Vega–Rodriguez v. Puerto Rico Tele. Co.*, 110 F.3d 174, 178–79 (1st Cir.1997); *United States v. Taketa*, 923 F.2d 665, 672–73 (9th Cir.1991). These cases are not helpful here because the analysis does not consider the effect of workplace surveillance in determining an employee's reasonable expectation of privacy. Instead, these cases focus on the expectation of privacy without the surveillance, and if the defendant demonstrates a reasonable expectation of privacy, whether or not the employer breached

that expectation with the use of the video surveillance.

**7.** It should be noted that *Bevan* is a civil case where the plaintiff asserted an invasion of privacy claim against government officials. Nevertheless, the privacy claim is based on Fourth Amendment protection from government intrusion and the courts apply the same expectation of privacy test set forth in *Katz*. *See also O'Connor v. Ortega*, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (applying the expectation of privacy test in suit brought pursuant to 42 U.S.C. § 1983 alleging Fourth Amendment violations).

Accordingly, we affirm the ruling of the trial court.

Chief Justice MULLARKEY dissents.

Chief Justice MULLARKEY, dissenting.

The majority concludes that the defendant, Carlos Galvadon, had a reasonable expectation of privacy in the back room of a retail liquor store based on his "exclusive control over the back room of the store." Maj. op. at 927–928. I respectfully dissent. I would find that Galvadon, as an employee of a retail liquor store, had no reasonable expectation in the store's back room because it was a liquor storage place subject to inspection at any time when the liquor store did business. Alternatively, I would hold that the police entered the back room under the emergency aid exception to the warrant requirement and properly seized the marihuana found in plain view.

At the outset, I note that I would decide this case on the merits rather than on standing as the majority does. Maj. op. at 925. The parties argued this case on standing, but I agree with the Supreme Court that these issues are better decided on the merits. *Minnesota v. Carter*, 525 U.S. 83, 87, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (Supreme Court noted that it had moved away from the concept of standing, and that when inquiring "whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." "). I do not agree with the majority that there is a special law of standing for Fourth Amendment claims. Maj. op. at 925. I would not adopt the majority's standing analysis because I find it unnecessarily complicated and abstract. *Cf. People v. Batchelor*, 800 P.2d 599, 601, n. 2 (Colo.1990) (deciding an overbreadth claim on the merits rather than on standing because "the Colorado doctrine of standing to challenge overbreadth has become more complex than the overbreadth doctrine."). The question, in my opinion, is whether the defendant had a reasonable ex-

pectation of privacy in the back room of a retail liquor store where he was employed.

Determination of this question requires examining the law regulating searches of business premises in highly regulated industries and the law defining an employee's reasonable expectation of privacy in his workplace.

With respect to highly regulated industries, the Supreme Court has recognized that searches may be conducted without warrants. The liquor business is perhaps the prime example of a highly regulated industry.

In Colorado, a retail liquor store may operate only if it complies with the Liquor Code, section 12–47–101, *et seq.* C.R.S. (2004), and its implementing regulations. The relevant regulations require a licensed retail liquor store to be open to warrantless inspection by administrative authorities and by peace officers during normal business hours and at all times when activity is occurring on the premises. The Code of Colorado Regulations 203–2, section 47–700 states:

> The licensed premises, including any places of storage where alcohol beverages are stored or dispensed, shall be subject to inspection by the State or Local Licensing Authorities and their investigators, or peace officers, during all business hours and all other times of apparent activity, for the purpose of inspection or investigation.”

1 C.C.R. 203–2, § 47–700 (2001) (emphasis added). Under this regulation, the back room of the liquor store in this case was open to inspection because the policy specifically applies to storage areas in a licensed premises.

The Supreme Court has recognized that not all workplaces have identical levels of Fourth Amendment protection. Indeed, the Colorado regulation is consistent with Supreme Court case law that recognizes an explicit exception to the warrant requirement for inspections of business premises within highly regulated industries in *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 77, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (warrant exception for inspections of the liquor industry); *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (warrant

exception applies to firearms industry); and *Donovan v. Dewey*, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (extending exception to inspections conducted pursuant to the Federal Mine Safety and Health Act of 1977). Of course, the constitutional rights at issue in these cases protect persons, not places, and the warrant exception at issue applies to the owners or proprietors of businesses within highly regulated industries. In summarizing the effect of these cases, the Supreme Court flatly stated that owners of businesses in highly regulated industries have *no* reasonable expectation of privacy in the premises. *Marshall v. Barlow's Inc.*, 436 U.S. 307, 313, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (The liquor industry has "such a history of government oversight that *no* reasonable expectation of privacy ... could exist for a proprietor over the stock of such an enterprise ... When an entrepreneur embarks upon such a business, he has voluntarily chosen to subject himself to a full arsenal of governmental regulation.") (emphasis added).

In *Colonnade, Biswell,* and *Donovan,* respectively, the Court spoke of the Fourth Amendment rights of the proprietors of businesses within highly regulated industries. An employee of a licensed liquor establishment like Galvadon has even more limited rights. In general, an employee's expectation of privacy in the workplace is subordinate to the employer's interests. *See O'Connor v. Ortega,* 480 U.S. 709, 717, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) ("The operational realities of the workplace, however, may make *some* employees' expectations of privacy unreasonable when an intrusion is by a supervisor rather than a law enforcement official.") (emphasis in original). Furthermore, when an employee knows, as Galvadon did, that he or she is being watched by an employer, "the affected workers [are] on clear notice from the outset that any movements they might make and any objects they might display within the work area would be exposed to the employer's sight." *Vega–Rodriguez v. Puerto Rico Tele. Company,* 110 F.3d 174, 180 (1st Cir.1997). In light of employees' reduced expectation of privacy vis-à-vis employers, an employee can never be said to have a greater expectation of privacy than an employer. This lower expectation of privacy vis-à-vis the employer is particularly acute where, as here, the employee takes the risk that the employer will find evidence of wrong doing by means of the video surveillance system in place and turn over such evidence to law enforcement.

I recognize that some employees may have a reasonable expectation of privacy in their workplaces. For example, in *Mancusi v. DeForte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968), the Supreme Court recognized that an office worker had a reasonable expectation of privacy in files stored in a room where he and several fellow employees had their desks. However, although employees enjoy Fourth Amendment protections in the workplace, the Supreme Court has observed that one's expectation of privacy in the workplace "is different from, and indeed less than, a similar expectation in an individual's home." *New York v. Burger,* 482 U.S. 691, 700, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987). I do not agree with the majority that "Galvadon was in a position much like the defendant in *Mancusi.*" Maj. op. at 931. Mancusi worked for a labor union; he was not an employee in a highly regulated industry like Galvadon.

This difference is important because the Supreme Court extended the highly regulated industries exception to *employees* working within such industries in *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 627, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) ("More importantly, the expectations of privacy of covered employees are diminished by reason of their participation in an industry that is regulated pervasively to ensure safety"). *See also Ortega,* 480 U.S. at 717, 107 S.Ct. 1492 ("public employees' expectations of privacy in their office, desks, and file cabinets, like similar expectations of employees in the private sector, may be reduced by virtue of actual office practices and procedures or by *legitimate regulation.*") (emphasis added); *United States v. Taketa,* 923 F.2d 665, 672 (9th Cir.1991) ("a valid regulation may defeat an otherwise reasonable expectation of workplace privacy.").

The highly regulated industries exception is premised upon the notion of consent. *See*

*Barlow's Inc.,* 436 U.S. at 313, 98 S.Ct. 1816 ("the business man in a highly regulated industry in effect consents to the restrictions placed upon him.") (quoting *Almeida–Sanchez v. United States,* 413 U.S. 266, 271, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973)). Both employer and employee are on notice that inspections may occur at any time. At the suppression hearing, Galvadon was asked whether he knew that the liquor store was "subject to inspection by officers or police officers." He answered "Yes. We've had inspections before." Thus, the evidence shows that not only was this liquor store part of a highly regulated industry, but the inspection regulation was enforced at this store and Galvadon knew it. If, as the Supreme Court said in *Barlow's Inc.,* the owner or proprietor of a business in a highly regulated industry has virtually *no* reasonable expectation of privacy, an employee of the same business likewise has *no* expectation of privacy in the workplace.

The majority states that some courts focus on the " 'nexus' between the area searched and the work space of the defendant;" while others focus on "a defendant's right to exclude others from accessing the area for which the defendant asserts privacy." Maj. op. at 930. Under either standard, Galvadon did not have the type of control over access to the back room that the majority suggests when it states that the back room was not accessible by the public and that "exceptions were made for delivery persons." Maj. op. at 931. Because the liquor code authorizes State or Local Licensing Authorities or their investigators and peace officers to enter areas where liquor is stored, including the back room, it is clear that Galvadon did not have the level of control over access to the back room that the majority relies upon for its holding that Galvadon enjoyed a reasonable expectation of privacy in the back room.

The fact that the police officers in this case were not in the back room of the store to conduct an inspection pursuant to the liquor code may be important in cases where there is evidence of bad faith by the police officers. However, there is no allegation of bad faith in this case, and the Supreme Court has made it clear that such bad faith does not affect the analysis of whether the individuals involved had any reasonable expectation of privacy. In *New York v. Burger,* the Supreme Court found that the analysis of whether the administrative search at issue had violated the Fourth Amendment was unaffected by the possibility that the search had been undertaken in order to uncover evidence of illegality unrelated to the regulatory scheme at issue. 482 U.S. at 716, 107 S.Ct. 2636; *see also* Perry S. Reich, *Administrative Searches for Evidence of Crime: The Impact of New York v. Burger,* 5 Touro L.Rev. 31, 46 (1988) ("the [Supreme] Court totally rejected the New York Court of Appeals' finding that there was no real administrative purpose for the statute, and that it was merely a pretext for allowing police to search for evidence of auto theft without the necessity of first obtaining a warrant.").

Similarly, in *Exotic Coins Inc. v. Beacom,* this court rejected the defendants' contention that "the *Colonnade–Biswell–Donovan* exception does not apply where the purpose of the search is to obtain evidence of crime rather than to further administrative or regulatory objectives." 699 P.2d 930, 943 (Colo. 1985). In rejecting this argument, we stated that "the possibility that searches under the Act could lead to discovery of criminal activity by a purchaser seems no more direct than that the administrative searches authorized by *Colonnade, Biswell* and *Donovan* might yield evidence of violation of criminal laws by the liquor dealers, firearms and ammunitions merchants, or mine owners involved in those cases." *Beacom,* 699 P.2d at 943. Thus, we held that evidence of other criminality discovered during an inspection of a business within a highly regulated industry need not be suppressed.

Under the reasoning of *Burger* and *Beacom,* the motivation behind the search at issue is immaterial in evaluating the validity of the search because those who work in highly regulated industries have a greatly diminished expectation of privacy in the workplace. *See* Neil Coleman McCabe, *Legislative Facts as Evidence in State Constitutional Search Analysis,* 65 Temp. L.Rev. 1229, 1236–37 (1992) (The mere fact of regu-

lation may illustrate that an employee's expectation of privacy in a pervasively regulated industry is not one society is willing to recognize as reasonable.). By suggesting that Juhl's presence in the back room was not authorized by the Liquor Code's inspection scheme, Maj. op. at 929, the majority improperly shifts the focus of the analysis from evaluating whether Galvadon had a reasonable expectation of privacy in the premises searched because of the regulatory scheme to whether Juhl's presence was reasonable. Whether Juhl's actions were reasonable is precisely the kind of analysis the majority said it would not undertake. Maj. op. at 925 (Fourth Amendment inquiry "does not permit this court to venture into the possible justifications or reasonableness of the police entering the back room."). As our decision in *Beacom* and the Supreme Court's decision in *Burger* imply, the motivation behind searches of businesses within a highly regulated industry does not mandate the suppression of evidence of other illegal activity and the motivation for the search is irrelevant to assessing whether the individual at issue had a reasonable expectation of privacy in the place searched.

The majority suggests that this case is controlled by *People v. Alexander*, 193 Colo. 27, 561 P.2d 1263 (1977). Maj. op. at 929, n. 4. I disagree. *Alexander* struck a particular provision of the liquor code, section 12–47–128, 5 C.R.S. (1973), on constitutional grounds because, as the concurrence explained, that provision was so broad that it allowed "the warrantless intrusion into 'any place' and, apparently, at any time. Likewise the scope and purposes of such a search are left to the discretion of any officer or other person authorized by the statute." *Alexander*, 193 Colo. at 30, 561 P.2d at 1266. The statutory provision analyzed in *Alexander* has since been amended and replaced with more specific language. As a result, the fact that the specific statutory provision analyzed in *Alexander* was held to be unconstitutional is irrelevant to this case.

Because I believe that the highly regulated industry exception is applicable here, I believe that Galvadon did not have a reasonable expectation of privacy in the back room. However, in the alternative, I would find that the evidence of marijuana found in the back room should not be suppressed because Officer Juhl's actions in entering the back room without a warrant were reasonable, and the subsequent search was permissible, under the emergency aid exception.

Under the emergency aid exception to the warrant requirement, a police officer may intervene without a warrant in situations where "both an immediate crisis existed" and there is some "probability that assistance will be helpful." *People v. Allison*, 86 P.3d 421, 426 (Colo.2004). Furthermore, "the officer's primary purpose must be to render emergency assistance, not to search for evidence," and the police must have a " 'reasonable basis' approximating probable cause that associates the emergency with the area to be searched." *Id.* Courts determine whether the officer had a reasonable basis "by examining the totality of the circumstances as they would appear to a prudent and trained police officer at the time the decision to conduct the warrantless search is made." *Id.*

Juhl testified that he saw Flores and Hogan "squaring off" as he passed the liquor store. His suspicions aroused, Juhl then decided to turn around and drive up to the liquor store. In the time it took Juhl to turn around, Flores and Hogan had gotten into a car parked directly in front of the liquor store.

As Juhl drove up, Galvadon, who had been standing in the threshold of the door to the liquor store, retreated into the liquor store; and Hogan and Flores got out of the car and approached Juhl. Hogan told Juhl that he and Flores had been attacked and that Flores had been sprayed by pepper spray.

At this point, Hogan led Flores into the store and told Galvadon that he was going to take Flores into the backroom to wash out Flores' eyes. Galvadon objected to this and asserted repeatedly that no one was allowed to go into the backroom. Hogan and Flores ignored Galvadon and entered the back room. Just prior to this exchange, Juhl radioed for medical assistance and backup.[1] In-

---

1. Although the majority states that Juhl radioed

for backup before he turned his patrol car

deed, when asked "what was your purpose in accompanying them [Flores and Hogan]?" Juhl responded "My concern—a couple concerns: One, he'd been assaulted; two, he was probably—Mr. Flores was probably in need of medical assistance, and that was my major concern at that point, was to stay with him and see what I could do for him."

Applying *Allison* to these circumstances, I would find it reasonable for Juhl to follow Flores and Hogan into the back room of the liquor store, to aid Flores, to investigate what had occurred, and potentially to protect Flores from Hogan and/or Galvadon, since either of them could have been Flores' attacker. There was more than a "theoretical possibility that another's life or safety [was] in danger." *Id.* Rather, this situation presented the requisite "colorable claim that another's life or safety is in danger." *Id.* Under the emergency aid exception, Juhl and the backup police officers were in a place where they had a right to be, and the marijuana was properly seized under the plain view doctrine.

In summary, I would find that Galvadon had no reasonable expectation of privacy in the back room of a retail liquor store because he was an employee in a highly regulated industry. Alternatively, I would find the emergency aid exception to the warrant requirement applied. Under either theory, the trial court erred in suppressing the evidence of marijuana found in the back room. Accordingly, I respectfully dissent.

around and returned to the liquor store, Maj. op. at 929, Juhl testified that he first radioed for medical assistance as Flores and Hogan were talking to Galvadon about going into the back room and that he radioed for backup because of officer safety concerns only after he had radioed for medical assistance and gone to the back room.