The PEOPLE of the State of Colorado, Plaintiff–Appellant

v.

Ricardo TERRAZAS–URQUIDI, Defendant–Appellee.

No. 07SA177.

Supreme Court of Colorado, En Banc.

Dec. 17, 2007.

Carol Chambers, District Attorney, Eighteenth Judicial District Andrew Cooper, Deputy District Attorney, Centennial, Colorado, Attorneys for Plaintiff–Appellant.

Douglas K. Wilson, Colorado State Public Defender Mitchell J. Ahnstedt, Deputy State Public Defender Jesse D. Hall, Deputy State Public Defender, Centennial, Colorado, Attorneys for Defendant–Appellee.

Justice RICE delivered the Opinion of the Court.

We review whether the district court properly suppressed a revolver as evidence. Upon review, we reverse the district court's pre-trial holding that because the officers were on someone else's private property when they took action leading to the discovery of the weapon, the evidence must be suppressed as against defendant Ricardo Terrazas–Urquidi. We hold that Terrazas–Urquidi did not have standing to challenge the admissibility of the evidence on those grounds, and therefore that the weapon cannot be suppressed for the reasons given by the district court. Terrazas–Urquidi also argues that even if the police did not violate his rights by remaining on the elderly woman's property, they violated his rights by effectively requiring him to open the door. We disagree and uphold the district court's finding that the officers' conduct at the shed door was constitutional.

### I. Facts and Procedural History

In December 2006, officers were dispatched to an address in Aurora in reference to a family argument. They learned that a juvenile female ("the victim") got into a fight with her mother after the victim found out that one of her cousins, a man named Rogelio Terrazas, had returned to the area. The victim said that the man had previously sexually assaulted her and that he had fled to Mexico after she reported the assault. The officers checked a computer database and verified that Rogelio Terrazas had an active warrant for sexual assault. The victim gave the officers a photograph and told them that while her alleged assailant's appearance had changed a bit since the photograph had been taken, it was a fairly decent photograph to use to identify him. In addition, the victim told the officers that Rogelio Terrazas did not have a primary residence, but he did have family members at several places in the area. In particular, she noted that he had family at 720 Havanah Street, and that he was known to frequent that address.

The victim and her mother went with four officers to a number of locations, eventually arriving at 720 Havanah Street. Two of the officers went behind the house to ensure that nobody would escape out the back, and the other two officers went to the front door. When the officers knocked on the door, an elderly woman answered and told them that Rogelio Terrazas was not in the house. She gave them consent to search the house,

which the officers did, but they did not find the alleged assailant.

After the officers failed to find Rogelio Terrazas, they went to the back of the house to meet the other two officers. When they reached the back corner of the house, they observed a structure that looked like a shed. They suspected that somebody was living in the shed because it had an electrical cord running to it from the house, and the front door had a peephole and a deadbolt. In fact, the district court later found that Terrazas–Urquidi was using the shed as living quarters, and that the shed was on property owned or lawfully possessed by the elderly woman.

The officers again split up, two going to the front of the shed and two going to the back. The officers knocked on the door, announced their presence, and told the occupant to open the door. The door cracked open several inches as a man stood inside the doorway. One of the officers mistakenly believed that the man was Rogelio Terrazas, the alleged assailant, based on the photo he had received. However, the man was later identified as defendant Ricardo Terrazas–Urquidi, who is Rogelio Terrazas's cousin. The officers could not see Terrazas–Urquidi's right hand because it was hidden by the door, but they could see a red light that might have been a cigarette or a laser where his hand would have been. The police ordered Terrazas–Urquidi several times to show his hands, but he did not comply. Then, one of the officers opened the door completely while yelling at Terrazas–Urquidi to show his hands. At that time, Terrazas–Urquidi's hand was empty. The officers pulled him out of the shed and handcuffed him. One of the officers went inside the shed and in plain view saw a revolver sitting on a shelf where Terrazas–Urquidi's right hand had been. The revolver had a laser attached to it, and its serial number was scratched off. After the police took Terrazas–Urquidi into custody, the victim stated that Terrazas–Urquidi was not Rogelio Terrazas.

Terrazas–Urquidi was arrested and charged with possession of a weapon by a previous offender, a class six felony, and possession of a defaced firearm, a class one misdemeanor. Before trial, the trial court held a hearing on the admissibility of the evidence. The court ruled that the police had received valid consent to search the house and that they had "every right" to be at the back of the house during the search. In addition, the court found that all police conduct that occurred after the police knocked on the shed door was proper, and that the officers acted reasonably to ensure officer safety. However, the court ruled that the police had violated Terrazas–Urquidi's constitutional rights by knocking on the shed door. It reasoned that the consent to remain on the elderly woman's property, including the property outside the shed, ended when the police concluded their search of the house. Therefore, the court found that the officers were trespassing when they walked up to the shed and knocked on the door.[1] Because the officers would not have found the weapon if they had not trespassed, the court ruled that the revolver was inadmissible under the fruit of the poisonous tree doctrine. The People filed an interlocutory appeal.

## II. Analysis

We reverse the trial court's ruling that the police violated Terrazas–Urquidi's constitutional rights when they knocked on the front door of the shed. Because Terrazas–Urquidi's constitutional claim concerns the elderly woman's privacy rights and not his own, we hold that Terrazas–Urquidi lacks standing to challenge the admissibility of the weapon. In addition, we reject Terrazas–Urquidi's invitation to overrule the trial court's holding that the police acted reasonably after they knocked on the door. Therefore, we overrule the trial court's ruling that the weapon was inadmissible, and we remand for trial.

1. Specifically, the trial court found that "they were illegally on the curtilage at the time that they approached the shed." However, because we hold that Terrazas–Urquidi lacks standing to bring this claim, which concerns the elderly woman's privacy rights, we need not analyze the doctrine of curtilage or its applicability here.

## A. Terrazas–Urquidi Lacks Standing to Object to Police Presence Outside the Shed

■ The People contend as a substantive matter that the police acted legally and properly when they approached the shed and knocked on the door. However, they argue that we need not address that substantive issue because Terrazas–Urquidi lacks standing to challenge the admissibility of the weapon. Because Terrazas–Urquidi's challenge must fail unless he has standing to bring it, *see United States v. Salvucci,* 448 U.S. 83, 86–87, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *People v. Spies,* 200 Colo. 434, 436, 615 P.2d 710, 711 (1980), we begin by addressing the standing issue.

■ Standing in the context of the Fourth Amendment is different than the general concept of judicial standing. *See People v. Galvadon,* 103 P.3d 923, 925 (Colo.2005). Normally, courts determine whether a person has standing by asking first whether he asserts his own rights rather than the rights of another, and second whether he has alleged injury in fact. *Id.* In the Fourth Amendment context, however, a person has standing only if the disputed search or seizure has infringed on an interest that the Fourth Amendment was designed to protect. *Id.* Courts have construed the Fourth Amendment as protecting only spaces in which a defendant has a legitimate expectation of privacy. *See, e.g., Spies,* 200 Colo. at 439–40, 615 P.2d at 714 (noting that whether a defendant has standing to contest a search depends on whether the state has violated his or her legitimate expectation of privacy). An expectation of privacy is legitimate only if the defendant manifested a subjective expectation of privacy in the searched area and society is prepared to recognize that expectation as reasonable. *People v. Haley,* 41 P.3d 666, 677 (Colo.2001) (Kourlis, J., dissenting).

Here, the trial court erred by holding that the police violated Terrazas–Urquidi's Fourth Amendment rights by remaining on the elderly woman's property outside of the shed after the search of her home ended. In making its determination, the trial court looked not to Terrazas–Urquidi's expectation of privacy, but instead to irrelevant factors such as the scope of the elderly woman's consent to search her home, and the extent of the curtilage of the elderly woman's home.[2] The trial court relied on these factors despite making a finding that Terrazas–Urquidi lacked a legitimate expectation of privacy in the area outside the shed door and that his reasonable expectation of privacy was limited to the shed itself.[3] In determining whether Terrazas–Urquidi lacks standing, we analyze whether the trial court's finding was correct that Terrazas–Urquidi lacked a legitimate expectation of privacy in the area outside the shed door. *See Spies,* 200 Colo. at 439–40, 615 P.2d at 714.

■ There can be no reasonable expectation of privacy in a residential area that is expressly or impliedly held open to casual visitors. *See People v. Shorty,* 731 P.2d 679, 682 (Colo.1987) (noting that an officer may enter residential areas that are expressly or impliedly held open to casual visitors). Consequently, this court has held that the police do not infringe upon an occupant's privacy rights by knocking on the door of a residence for the purpose of investigating a crime. *People v. Baker,* 813 P.2d 331, 333 (Colo. 1991); *accord Shorty,* 731 P.2d at 682 (holding that there was no reasonable expectation of privacy underneath a doormat outside an apartment door). In this case, Terrazas–Urquidi impliedly held open the area outside the shed door to casual visitors. He was using the shed as living quarters, and the front door contained a peephole and a deadbolt, suggesting that he expected casual visitors.[4] For these reasons, we agree with the

2. In addition, the trial court found that Terrazas–Urquidi had a legitimate expectation of privacy in the interior of the shed. We do not disturb this finding, but we note that it is irrelevant to the question of whether he had a reasonable expectation of privacy in the area outside the shed door.

3. The court emphasized the limited scope of Terrazas–Urquidi's reasonable expectation of privacy by stating that it was "[o]nly in the shed. Only as an occupant of the shed."

4. We also note that there is no direct evidence that Terrazas–Urquidi had a subjective expectation of privacy. To the contrary, the fact that the door contains a peephole and a deadbolt, togeth-

trial court's finding that Terrazas–Urquidi lacked a legitimate expectation of privacy in the area outside the front door. Consequently, we hold that he lacks standing to claim that the officers' presence there when they knocked on the door violated his rights.

## B. The Record Supports the Trial Court's Finding That the Police Acted Reasonably After Knocking on the Shed Door

 Terrazas–Urquidi additionally argues that even if the police did not violate his rights by remaining on the elderly woman's property, they illegally seized him by requiring him to open the door. We disagree, and we uphold the trial court's finding that the officers' conduct at the shed door did not violate Terrazas–Urquidi's Fourth Amendment rights.[5]

 "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), *quoted in People v. Cascio,* 932 P.2d 1381, 1386 (Colo.1997). Terrazas–Urquidi contends that the police knocked and spoke in such a manner that a reasonable person would not have believed he was free to leave the premises or to disregard their demands to open the door. However, the trial court found that the officers had acted reasonably, stating, "[I]n plain language, if the officers had been there legally, meaning at the front door of the shed, I find that their actions thereafter were reasonable and therefore legal given the circumstances they faced." In so finding, the trial court implicitly determined that a reasonable person would not have believed that he must open the door

because otherwise the court would have been compelled to hold that the police actions were unreasonable. *See Mendenhall,* 446 U.S. at 554, 100 S.Ct. 1870 (setting forth the standard that a person is seized if a reasonable person in the same circumstances would believe that he was not free to leave).

Therefore, Terrazas–Urquidi's argument that he was illegally seized cannot prevail unless the trial court's findings are unsupported by the record. *See People v. Humphrey,* 132 P.3d 352, 360 (Colo.2006) (stating that higher courts defer to lower courts' findings of fact when they are supported by the record). The record in this case includes testimony by officers who were present at the scene, and that testimony indicates that the officers knocked on the shed door, identified themselves as police, and stated that the occupant should open the door. The record does not suggest that the officers made any threats or other statements that would cause a reasonable person to believe he must open the door.[6] Therefore, the record supports the trial court's finding that the officers acted reasonably by knocking on the door, announcing their presence, and telling the occupant to open the door.

## III. Conclusion

Because Terrazas–Urquidi lacks standing to object to the police officers' presence on the elderly woman's property, we reverse the trial court's ruling that the revolver must be suppressed. Additionally, we affirm the trial court's finding that the officers' conduct at the shed door was legal. Hence, we reverse the ruling of the trial court regarding the suppression of the revolver.

---

er with the other circumstances, suggests that Terrazas–Urquidi expected both friends and strangers to approach his front door.

5. Because this argument concerns Terrazas–Urquidi's own Fourth Amendment rights, no standing issue is presented.

6. The record includes testimony from Officer Wilkinson that he heard Officers Schol and Bunch "knock[ ] on the front door" of the shed

and "announce that it was the police and they wanted him to open the door." Second, Officer Bunch testified that after knocking on the door, "I identified ourselves as police officers in both English and Spanish," and "I believe I said open the door in English and Spanish, but I don't recall for sure if I did or not." Terrazas–Urquidi argues that this testimony suggests that he was not free to leave. We disagree.