The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
January 25, 2018

## 2018COA5

**No. 14CA2479, *People v. Campbell* — Constitutional Law —
Fourth Amendment — Reasonable Expectation of Privacy**

A division of the court of appeals considers whether a
defendant has a reasonable expectation of privacy under the United
States and Colorado Constitutions in global positioning system
(GPS) data acquired from a defendant's ankle monitor.  The division
concludes that the defendant did not have a reasonable expectation
of privacy when the GPS data was voluntarily given to law
enforcement officials by the company that owned the ankle monitor.
The division further concludes that the trial court did not err in
admitting the GPS evidence without first conducting a hearing to
assess its reliability pursuant to *People v. Shreck*, 22 P.3d 68 (Colo.
2001).

The division also rejects the defendant's contentions that he was seized and searched in violation of the Fourth Amendment and that the victim's in-court identification should have been suppressed due to an unconstitutionally suggestive out-of-court identification procedure.

Accordingly, the division affirms the judgment of conviction.

COLORADO COURT OF APPEALS                                    **2018COA5**

Court of Appeals No. 14CA2479
Jefferson County District Court No. 12CR1091
Honorable Philip J. McNulty, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Brandon Deshawn Campbell,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE TAUBMAN
Furman and Richman, JJ., concur

Announced January 25, 2018

Cynthia H. Coffman, Attorney General, Elizabeth Rohrbough, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Suzan Trinh Almony, Alternate Defense Counsel, Broomfield, Colorado, for
Defendant-Appellant

¶ 1    Defendant, Brandon Deshawn Campbell, appeals his judgment of conviction entered on jury verdicts finding him guilty of two counts of second degree burglary, one count of attempted second degree burglary, and three counts of criminal mischief.  He contends that the trial court erred in denying his motion to suppress global positioning system (GPS) location data obtained via an ankle monitor he wore at the time of his arrest.  As a matter of first impression, we conclude that Campbell did not have a reasonable expectation of privacy in the GPS data under the United States or Colorado Constitutions.  Because we also perceive no grounds for reversal with regard to Campbell's remaining contentions, we affirm.

## I.  Background

¶ 2    In late April 2012, the victim, J.P., called 911 to report an intruder in his home.  He provided the 911 dispatcher with a description of the intruder and stated that he believed the suspect had driven away in a white Ford Explorer.

¶ 3    Officers stopped a white Ford Explorer about ten minutes later approximately three miles from the victim's home.  Campbell was the driver and only occupant of the vehicle.  Officers searched

Campbell and found he was wearing an ankle monitor. A detective later requested and received the GPS data from the company owning the ankle monitor. The GPS data revealed that, within the month before J.P.'s home was broken into, Campbell had been at the location of two other homes when they were burglarized. The GPS data also placed Campbell at J.P.'s house at the time of the break-in. Campbell was convicted of two counts of second degree burglary, one count of attempted second degree burglary, and three counts of criminal mischief.

¶ 4     On appeal, Campbell asserts that the trial court erred by denying his motions (1) to suppress evidence obtained as a result of a seizure and subsequent search of his person; (2) to suppress the GPS data obtained from the ankle monitor; (3) for a hearing to assess the admissibility of the GPS data; and (4) to suppress J.P.'s show-up identification. We disagree with all these contentions.

## II. Motion to Suppress Fruit of Seizure and Search

¶ 5     Campbell contends that the trial court erred in denying his motion to suppress evidence obtained as a result of an illegal seizure and search of his person. He argues that the officers' use of handcuffs and firearms transformed his seizure into an arrest

2

unsupported by probable cause.  In the alternative, Campbell asserts that, even if the officers' use of force did not constitute an arrest, the officers nonetheless lacked reasonable suspicion to conduct an investigative detention.  We conclude that the stop and subsequent search were lawful.

### A.  Additional Facts

¶ 6     Officer Dave Smidt responded to J.P.'s 911 call.  He was given the location of the alleged break-in and told that the suspect was a black male driving "an older model SUV, possibly a white Ford Explorer."  Less than ten minutes after the victim called 911, Officer Smidt saw a white Ford Explorer driven by a black man in the area of the victim's home.  He pursued the vehicle.  Officer Smidt testified that he saw the vehicle turn rapidly without signaling before it eventually pulled over.  He recounted that "it appeared the car was trying to get away from [him]."

¶ 7     After the vehicle stopped, Officer Smidt and another officer who had arrived in a separate car conducted a "felony traffic stop" — they drew their weapons and ordered Campbell to exit the car, put his hands up, walk backwards toward them, and kneel so that he could be placed in handcuffs.  After conducting a pat-down of

3

Campbell, the officers discovered he had an outstanding arrest warrant. He was then placed in the back of one of the police vehicles. He later made incriminating statements that he sought to suppress. Additionally, Campbell sought to suppress evidence of the officers' discovery of the ankle monitor during the pat-down search.

¶ 8 In a bench ruling on the motion to suppress, the trial court stated in its findings of fact that Officer Smidt had followed Campbell for "a number of blocks" during which time "it looked like the driver was trying to get away from him." The officer also observed Campbell commit traffic violations, specifically "failure to signal a turn" and potentially speeding by going "faster than [was] prudent in a residential neighborhood." The trial court concluded that the officers had reasonable suspicion sufficient to stop Campbell, and that reasonable suspicion ripened into probable cause to arrest after J.P. identified Campbell as the intruder in a one-on-one showup conducted shortly after he was first stopped. As a result, the trial court denied Campbell's motion to suppress.

## B. Standajrd of Review

¶ 9    In reviewing a ruling on a motion to suppress, we defer to a trial court's findings of fact if they are supported by competent evidence in the record. *People v. King*, 16 P.3d 807, 812 (Colo. 2001). We review conclusions of law de novo. *Id.*

## C. Applicable Law

¶ 10    The United States and Colorado Constitutions protect against unreasonable searches and seizures. U.S. Const. amends. IV, XIV; Colo. Const. art. II, § 7. A warrantless arrest is reasonable when an officer has probable cause to believe that a crime has been or is being committed. *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). Because probable cause is an objective inquiry, an officer's subjective intent is irrelevant. *See People v. Cherry*, 119 P.3d 1081, 1083 (Colo. 2005). Thus, it is irrelevant if the offense that established probable cause is unrelated to the offense actually charged by the arresting officer. *Id.*

¶ 11    "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001)

(holding that officer had probable cause to make custodial arrest when he observed woman driving without wearing a seatbelt, a criminal violation under state traffic code); *see People v. Triantos*, 55 P.3d 131, 134 (Colo. 2002); *see also* § 16-3-102(1)(b), C.R.S. 2017 (authorizing a peace officer to make an arrest when "[a]ny crime has been or is being committed by [a] person in his presence").

¶ 12    In the context of vehicle stops, "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996); *see also Cherry*, 119 P.3d at 1083.  Although minor traffic infractions are classified as "civil matter[s]" under Colorado statute, § 42-4-1701(1), C.R.S. 2017, an officer may constitutionally stop a driver based on observation of even a minor traffic infraction.  *See Cherry*, 119 P.3d at 1084 (concluding that officer's observation of defendant committing two class B traffic infractions justified stop); *see also People v. Chavez-Barragan*, 2016 CO 16, ¶ 10, 365 P.3d 981, 983 ("Suspicion of even a minor traffic offense can provide the basis for a stop."); *People v. Altman*, 938 P.2d 142, 145 (Colo. 1997) (concluding that "troopers

had a reasonable suspicion that criminal activity had occurred or was occurring" when they observed minor traffic infractions).

### D. Analysis

¶ 13 We conclude that the officers constitutionally stopped Campbell on the basis of traffic violations witnessed by Officer Smidt. Further, the officers had probable cause to believe Campbell was committing the felony of vehicular eluding, and therefore constitutionally arrested and searched him. We can affirm "on different grounds than those relied upon by the trial court" if those grounds are supported by "undisputed facts in the record." *People v. Aarness*, 150 P.3d 1271, 1277 (Colo. 2006), *as modified on denial of reh'g* (Jan. 16, 2007). Campbell has not disputed Officer Smidt's testimony with regard to the observed traffic violations, and does not assert on appeal that the trial court's findings of fact on this point were clearly erroneous.

¶ 14 The parties initially limited their arguments to whether the officers had reasonable suspicion to stop Campbell, which was the basis for the trial court's denial of Campbell's motion to suppress. We requested supplemental briefing from both parties on the issue

7

of whether the violations observed by Officer Smidt gave rise to probable cause to stop and arrest Campbell.

¶ 15     Officer Smidt testified that he observed Campbell turn without signaling, a class A traffic infraction under Colorado law. *See* § 42-4-903(2), (5), C.R.S. 2017. We conclude that Officer Smidt's observation of this violation of the traffic code justified the initial stop, regardless of whether the description communicated by the dispatcher independently created reasonable suspicion sufficient to stop the vehicle.

¶ 16     In their supplemental brief, the People further argue that the officers had probable cause to believe that Campbell was eluding the officers in violation of section 18-9-116.5(1), C.R.S. 2017, a class 5 felony. The record supports this contention. In its findings of fact, the trial court noted that "it looked like the driver was trying to get away from" the officer because the driver did not stop for several blocks after the officer first activated his lights and sirens. We therefore agree that "the facts and information within the arresting officers' knowledge [we]re sufficient" to cause them to believe Campbell was committing the felony of vehicular eluding. *People v. Bustam,* 641 P.2d 968, 972 (Colo. 1982).

¶ 17     Because the officers had the right to arrest Campbell for vehicular eluding, they had the right to use reasonable force in effectuating the arrest, *see* § 18-1-707(1)(a), C.R.S. 2017, and conduct a search of Campbell's person incident to arrest, *see Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980). Thus, we conclude that the trial court did not err in denying Campbell's motion to suppress evidence obtained as a result of his seizure and search.

### III.  Motion to Suppress GPS Data

¶ 18     Campbell asserts that the trial court erred in denying his motion to suppress the GPS data obtained from the ankle monitor. As an issue of first impression in Colorado, we conclude that, because Campbell did not have a reasonable expectation of privacy in the GPS location data generated by the ankle monitor under the United States or Colorado Constitutions, the trial court did not err.

### A.  Additional Facts

¶ 19     When Campbell was arrested, the officers found a monitor on his ankle, which Campbell said he was wearing at the request of a private bail bondsman. The officers did not remove the ankle monitor.

¶ 20    After Campbell's arrest, Detective George McGlynn contacted the GPS monitoring company, Interstate Monitoring Bureau Corporation, to request the data generated by the ankle monitor. Detective McGlynn did not seek a warrant for this GPS data. Rather, Interstate Monitoring voluntarily provided the information requested. As explained during trial, the documents provided by the monitoring company detailed Campbell's location every five minutes. The records introduced at trial covered over one month of Campbell's whereabouts, totaling 9643 "tracking events" or five-minute increments. Based on the records, Detective McGlynn determined that Campbell had been at J.P.'s home, as well as two other homes when they were burglarized in March and April of 2012.

¶ 21    In its bench ruling, the trial court concluded that Campbell lacked standing to challenge the allegedly unconstitutional search of the GPS data. In its findings of fact, the trial court noted that the ankle monitor had been imposed "as a condition of bond, whether it [was] court ordered or ordered by the bondsman." The trial court reasoned that Campbell was "not asserting his own rights" because, even if the bondsman might have an expectation of privacy in the

10

records maintained by the monitoring company, Campbell did not. In light of its conclusion that Campbell lacked standing to contest the collection of the GPS data, the trial court denied his motion to suppress.

### B.  Standard of Review

¶ 22   In reviewing a ruling on a motion to suppress, we defer to a trial court's findings of fact if they are supported by competent evidence in the record.  *King,* 16 P.3d at 812.  We review conclusions of law de novo.  *Id.*

### C.  Applicable Law

¶ 23   The constitutional protections against unreasonable searches and seizures are personal.  *See Alderman v. United States*, 394 U.S. 165, 174 (1969) ("Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.").  To invoke the Fourth Amendment's protections, a defendant must show that "the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." *Rakas v. Illinois*, 439 U.S. 128, 140 (1978).

¶ 24   While often referred to as an issue of standing, the *Rakas* Court recognized that this threshold question "belongs more

properly under the heading of substantive Fourth Amendment doctrine than under the heading of standing." *Id.*; *see also Rawlings*, 448 U.S. at 106 (noting that, after *Rakas*, the standing inquiry merged with the substantive question "whether governmental officials violated any legitimate expectation of privacy" held by the defendant). Thus, a person has "standing" to challenge a search "if the defendant maintained a reasonable expectation of privacy in the place searched." *People v. Galvadon*, 103 P.3d 923, 930 (Colo. 2005).

¶ 25 To assess whether a defendant had a reasonable expectation of privacy in the place searched, we turn to the two-prong test set forth in *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). *People v. Gutierrez*, 222 P.3d 925, 932 (Colo. 2009). Under that test, "[a] defendant must have an actual expectation that the area or activity subjected to governmental intrusion would remain free of such intrusion and such an expectation must be one that 'society is prepared to recognize as reasonable.'" *Galvadon*, 103 P.3d at 929 (quoting *People v. Oates*, 698 P.2d 811, 814 (Colo. 1985)).

¶ 26    In a line of cases, the United States Supreme Court has held that a person has no reasonable expectation of privacy in information he or she voluntarily discloses to a third party. *See Smith v. Maryland,* 442 U.S. 735, 742-43 (1979); *United States v. Miller*, 425 U.S. 435, 443 (1976); *Hoffa v. United States*, 385 U.S. 293, 302 (1966). Thus, "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities." *Miller*, 425 U.S. at 443. This is true "even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." *Id.*

¶ 27    The Colorado Supreme Court, however, has held that article II, section 7 of the Colorado Constitution encompasses a "broader definition of what constitutes a legitimate expectation of privacy from government intrusion than that of its federal counterpart." *Galvadon,* 103 P.3d at 927. Thus, the Colorado Supreme Court held that a bank customer had a reasonable expectation of privacy in his bank records under the Colorado Constitution, despite Supreme Court precedent that no reasonable expectation of privacy in such records exists under the Fourth Amendment. *Charnes v.*

13

*DiGiacomo*, 200 Colo. 94, 98-100, 612 P.2d 1117, 1119-21 (1980) (discussing and declining to follow *Miller*, 425 U.S. 435); *cf. Gutierrez*, 222 P.3d at 935 (finding third party doctrine inapplicable and holding that taxpayers have reasonable expectation of privacy in income tax returns even when they disclose them to the Internal Revenue Service, the state department of revenue, and tax preparers). Similarly, the Colorado Supreme Court has held that telephone users have a reasonable expectation of privacy in the numbers they dial, despite the Supreme Court's holding to the contrary. *People v. Sporleder*, 666 P.2d 135, 142 (Colo. 1983) (discussing and declining to follow *Smith*, 442 U.S. 735).

### D. Analysis

¶ 28 To begin, we address the first prong of *Katz*, under which a defendant must have an actual expectation of privacy in the place searched. Campbell urges that he maintained a subjective expectation that the GPS data generated by his ankle monitor would not be exposed or otherwise subjected to "public scrutiny."

¶ 29 As support for this assertion, he notes that the monitoring company stored the data "in a web-based secured interface." Further, Campbell asserts that, because he wore the ankle monitor

14

at the request of a private bail bondsman, he believed the sole purpose of the GPS monitoring was to ensure that he did not abscond from the state and thereby fail to appear in court. He did not anticipate that the data would be used "to facilitate criminal investigations." We assume without deciding that Campbell had an actual, subjective expectation of privacy in the GPS data. *See Gutierrez*, 222 P.3d at 932 (deferring to trial court's finding that the defendant had a subjective expectation of privacy in tax returns where tax preparer kept the records in a secure cabinet).

¶ 30     Nevertheless, we conclude under the second prong of *Katz* that any expectation of privacy in the GPS data was not "one that society is prepared to recognize as 'reasonable.'" *Katz*, 389 U.S. at 361 (Harlan, J., concurring). Campbell asserts that "other jurisdictions have held that GPS location data implicates an individual's privacy interest." However, the cases he cites in support of that argument involved circumstances in which law enforcement agents surreptitiously installed GPS tracking devices on individuals' vehicles without obtaining warrants. *See, e.g., United States v. Jones*, 565 U.S. 400 (2012). Campbell correctly asserts that those cases generally acknowledge the "unique attributes of GPS

surveillance." *Id.* at 415 (Sotomayor, J., concurring). Certainly, several courts have recognized that long-term GPS monitoring "generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." *Id.*

¶ 31 However, the cases cited by Campbell do not address the precise issue here — whether a defendant has a reasonable expectation of privacy in GPS location data transmitted to and collected by a third party. Under the Supreme Court precedent, Campbell had no reasonable expectation of privacy in the GPS data because he voluntarily disclosed such data to a third party — his bondsman. Campbell was aware that his bondsman had access to the GPS location data to ensure that he did not leave the state while out on bond. In short, Campbell "t[ook] the risk, in revealing his affairs to another, that the information w[ould] be conveyed by that person to the Government." *Miller*, 425 U.S. at 443. Thus, even if we assume he subjectively believed his GPS data would remain private, that expectation was not one society would be prepared to call reasonable.

¶ 32    We reach the same result even under the broader protections afforded by the Colorado Constitution.  In *Charnes v. DiGiacomo*, the supreme court distinguished *Miller*, 425 U.S. 435, by noting that a bank customer does not truly voluntarily disclose information about his or her financial transactions because bank accounts are necessary in modern life and because the customer's primary purpose in having a bank account is facilitating the transfer of funds.  200 Colo. at 99, 612 P.2d at 1121 (discussing and following *Burrows v. Superior Court*, 529 P.2d 590 (Cal. 1974)).  In contrast, here, Campbell chose to contract with the private bail bondsman and knew that the primary purpose of the ankle monitor was to track and record his location.  Further, Campbell could not reasonably have anticipated that the GPS data would remain "free from governmental intrusion," *Sporleder*, 666 P.2d at 140, when the bail bondsman could have reported his location to the court had he absconded in violation of his bond terms.

¶ 33    Accordingly, we conclude that Campbell cannot invoke the protections of either the Fourth Amendment of the United States Constitution or article 2, section 7 of the Colorado Constitution because he had no reasonable expectation of privacy in the GPS

data. Thus, the trial court did not err in denying his motion to suppress.

## IV. Admissibility of GPS Data

¶ 34 Campbell next contends that the trial court erred in admitting the GPS evidence without first holding a hearing to assess its reliability pursuant to *People v. Shreck*, 22 P.3d 68 (Colo. 2001). We disagree.

## A. Additional Facts

¶ 35 Before trial, Campbell moved for a *Shreck* hearing on the admissibility of the GPS records and any expert testimony relating to that data. Campbell asserted that a hearing was necessary to assess the reliability of the evidence because Interstate Monitoring was not obligated to test the ankle monitor devices or ensure their accuracy, and because GPS technology is "fairly new."

¶ 36 In denying the motion for the *Shreck* hearing, the trial court stated that "GPS has been around for a long time." The trial court therefore concluded that "this is not the type of new and novel scientific evidence" that must be vetted by a pretrial evidentiary hearing.

¶ 37    During trial, Bruce Derrick testified as an expert in GPS

devices and technology.  Derrick worked for SecureAlert, the

manufacturer of the ankle monitor Campbell was wearing when

arrested.  He testified how GPS devices communicate location data

to a monitoring center, as well as the specific mechanics of the

ankle monitor device.  Defense counsel cross-examined Derrick at

length on the accuracy of GPS location data.

## B.  Standard of Review

¶ 38    We review a trial court's evidentiary ruling for an abuse of

discretion.  *People v. Veren*, 140 P.3d 131, 136 (Colo. App. 2005).  A

trial court abuses its discretion when its ruling is "manifestly

arbitrary, unreasonable, or unfair."  *Id.*

¶ 39    We review any error in denying a *Shreck* hearing under the

nonconstitutional harmless error standard.  *People v. Wilson*, 2013

COA 75, ¶ 24, 318 P.3d 538, 543.  Under this standard, we will

reverse only if the error "substantially influenced the verdict or

affected the fairness of the trial proceedings."  *Hagos v. People*,

2012 CO 63, ¶ 12, 288 P.3d 116, 119 (quoting *Tevlin v. People*, 715

P.2d 338, 342 (Colo. 1986)).

## C.  Applicable Law

19

¶ 40     CRE 702 governs the admissibility of scientific evidence as well as expert testimony.  *Shreck*, 22 P.3d at 77.  A trial court's determination as to scientific evidence's admissibility should be "broad in nature" and flexible, with the ultimate goal of assessing whether the evidence is relevant and reliable.  *Id.*  A trial court assesses whether scientific evidence and related expert testimony are admissible by considering whether (1) the scientific principles underlying the expert's testimony are reliable; (2) the expert is qualified to give an opinion on the subject; (3) the testimony will be helpful to the jury; and (4) the probative value of the testimony is substantially outweighed by the danger of unfair prejudice.  *See id.* at 77-79; *see also People v. Rector*, 248 P.3d 1196, 1200 (Colo. 2011).

¶ 41     Once a party requests that evidence be subjected to a *Shreck* analysis, the trial court can, in its discretion, hold an evidentiary hearing on the matter.  *Wilson*, ¶ 23, 318 P.3d at 543.  However, the trial court is not required to conduct an evidentiary hearing if it "already has sufficient information to make specific findings under *Shreck*."  *Id.*

¶ 42    Concerns about conflicting theories or the reliability of scientific principles go to the weight of the evidence, not its admissibility. *See Estate of Ford v. Eicher*, 250 P.3d 262, 269 (Colo. 2011). Such concerns "are adequately addressed by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Id.* (citing *Shreck*, 22 P.3d at 78).

### D.  Analysis

¶ 43    We conclude that the trial court did not abuse its discretion in denying Campbell's motion for a pretrial hearing on the admissibility of the GPS data. GPS technology is prevalent in modern society and widely regarded as reliable. "Courts routinely rely on GPS technology to supervise individuals on probation or supervised release, and, in assessing the Fourth Amendment constraints associated with GPS tracking, courts generally have assumed the technology's accuracy." *United States v. Brooks*, 715 F.3d 1069, 1078 (8th Cir. 2013). Indeed, the concurrence in *Jones* acknowledged that GPS technology in modern cell phones "permit[s] more precise tracking" than previous technology allowed. *Jones*, 565 U.S. at 428 (Alito, J., concurring in the judgment). The

overarching concern of any *Shreck* analysis is the reliability and relevance of the scientific evidence, and we conclude, like other courts, that GPS evidence is sufficiently reliable to satisfy CRE 702.

¶ 44    We realize that Colorado's standard for the admissibility of scientific evidence differs from the test laid out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and that other state rules of evidence may differ from CRE 702.  Nevertheless, we find it instructive to consider the admissibility of GPS evidence in other jurisdictions which have held that GPS evidence is reliable and, thus, admissible.  *See Brooks*, 715 F.3d at 1078 (affirming district court's taking judicial notice of "the accuracy and reliability of GPS technology," and thus allowing GPS evidence without expert testimony); *United States v. Mathews*, 250 F. Supp. 3d 806, 819 (D. Colo. 2017) (denying the defendant's motion for a *Daubert* hearing on GPS data and stating that the defendant's challenge to the accuracy of the GPS data was "a matter for cross-examination"); *Brown v. State*, 163 S.W.3d 818, 824 (Tex. App. 2005) (holding GPS records sufficiently reliable); *see also* James Beck et al., *The Use of Global Position System (GPS) and Cell Tower Evidence to Establish a Person's Location*, 49 No. 1 Crim. L. Bull. art. 7 (Winter 2013) ("The

relatively unchallenged science behind GPS and the extensive, successful reliance on the technology during the past 30 years justify its admissibility in court."); *cf. United States v. Thompson*, 393 F. App'x 852, 859 (3d Cir. 2010) (allowing a lay witness "to testify concerning the operation of [a] GPS device").

¶ 45 In any event, here, Derrick was properly qualified to testify as an expert on GPS technology. Campbell conducted voir dire of Derrick and thoroughly cross-examined him on the accuracy of GPS technology generally and the ankle monitor device specifically.

¶ 46 In light of the reliability of GPS evidence, we conclude that the trial court did not err in denying Campbell's motion for a pretrial *Shreck* hearing.

## V. Motion to Suppress Identification

¶ 47 Campbell's final contention is that the trial court erred in denying his motion to suppress J.P.'s identification. He asserts that, because the out-of-court identification procedure was unduly suggestive and unreliable, admission of J.P.'s in-court identification violated his constitutional due process rights. We disagree.

## A. Additional Facts

¶ 48     J.P. encountered Campbell in the stairway of his house.  The victim had just woken up when he heard noises downstairs, and he was not wearing his contact lenses or eyeglasses.  It was midmorning and the house was well lit.  The two men were approximately ten feet away from each other for one or two seconds before Campbell ran out of the house.  During the 911 call, the victim described Campbell as a black male, about 5'8" or 5'9" tall, wearing a dark gray or black hoodie, dark jeans, and white sneakers.

¶ 49     When officers stopped Campbell's car, the victim was still on the line to the 911 dispatcher.  The dispatcher told him that officers had pulled over a vehicle matching the description he had given.  Shortly after the 911 call ended, an officer took the victim to the location where Campbell had been pulled over.

¶ 50     When the victim got to the scene of Campbell's arrest, there were four or five police vehicles, two police motorcycles, and more than eight police officers present.  There were no other people aside from Campbell and the victim.  When the victim was driven to the

24

scene, Campbell was seated in the backseat of a police vehicle in handcuffs. Campbell was the only black person at the scene.

¶ 51 The victim testified that he "knew almost immediately" that Campbell had been the man who broke into his home. An officer told him to "slow down [and] make sure." After another minute or so, the victim again positively identified Campbell. The victim was wearing eyeglasses during the show-up identification, though he later testified that his uncorrected vision was "not bad" and he merely preferred to have eyeglasses on.

¶ 52 The trial court found that the show-up procedure utilized by the officers here was suggestive. However, the trial court nonetheless denied Campbell's motion to suppress the out-of-court identification because it found that the identification was reliable under the totality of the circumstances.

## B. Standard of Review

¶ 53 We review a trial court's determination on the admissibility of an identification as a mixed question of fact and law, affording deference to the findings of fact and reviewing the legal conclusions de novo. *See Bernal v. People*, 44 P.3d 184, 190 (Colo. 2002).

¶ 54     We review preserved errors of constitutional dimension for constitutional error, meaning we will reverse unless the People show that the error was harmless beyond a reasonable doubt. *Hagos*, ¶ 11, 288 P.3d at 119.

## C.  Applicable Law

¶ 55     In considering a challenge to an out-of-court identification, a court must follow a two-step analysis.  *Bernal*, 44 P.3d at 191.  First, a defendant must prove that the identification procedure was unduly suggestive.  *See id.*  If the defendant shows the procedure was impermissibly suggestive, the burden then shifts to the People to show that the identification was nevertheless reliable under the totality of the circumstances.  *Id.*

¶ 56     Under the second step of this analysis, the court may consider several factors, including "(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation."  *Id.* at 192.  Ultimately, the suggestiveness of the identification procedure must be balanced against the indicia of

reliability; provided that there is not a "very substantial likelihood of irreparable misidentification," the identification is admissible. *Id.*; *see also People v. Weller*, 679 P.2d 1077, 1083 (Colo. 1984).

### D. Analysis

¶ 57 The trial court found, Campbell argues, and the People do not contest that the show-up procedure utilized here was impermissibly suggestive. We agree. When the victim arrived at the scene of Campbell's arrest, Campbell was handcuffed in the back of a police vehicle surrounded by officers and he was the only black person present. Moreover, the dispatcher told the victim that officers had pulled over a vehicle matching his description. This show-up procedure was impermissibly suggestive. *See generally Weller*, 679 P.2d at 1083 ("One-on-one showups are not favored and tend to be suggestive.").

¶ 58 Nevertheless, we conclude that the People met their burden of proving that the identification was reliable despite the suggestive procedure. With regard to the first factor set forth in *Bernal*, the victim had the opportunity to see the intruder for one or two seconds in a well-lit area while the two men were about ten feet away from one another. Moreover, the victim testified that,

27

although he was not wearing contact lenses or eyeglasses, he felt he was able to see the intruder sufficiently to later identify him. As for the second factor, the trial court concluded that the victim was startled when he encountered the intruder, which heightened his degree of attention, and we defer to this finding.

¶ 59    The third factor — the accuracy of the witness' description — weighs less in favor of the People. The victim's description of the intruder was somewhat generic, and there were inconsistencies between the description provided to the 911 dispatcher and Campbell's actual appearance. However, looking to the fourth factor, the victim's confidence in the identification was high. He quickly confirmed that Campbell was the intruder once on the scene, and he later testified that he was ninety-five percent sure his identification was accurate. He was also "very positive" on the color, make, and model of the car that he saw driving away from his home. Finally, the time between the crime and confrontation was extremely brief. The identification occurred less than an hour after the victim first saw the intruder.

¶ 60    In sum, especially in light of the strength of the final two factors, we conclude that the identification was reliable despite the

28

suggestiveness of the procedure. We cannot say that, given the totality of the circumstances, there was a "very substantial likelihood of irreparable misidentification." *Bernal*, 44 P.3d at 192. As a result, we conclude the trial court did not err in denying the motion to suppress the identification.

## VI.  Conclusion

¶ 61    Accordingly, the judgment is affirmed.

JUDGE FURMAN and JUDGE RICHMAN concur.