23CA0862 Peo v Petrie 11-06-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA0862
Adams County District Court No. 20CR3391
Honorable Patrick H. Pugh, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

James Petrie,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE MEIRINK
Fox and Hawthorne*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 6, 2025

Philip J. Weiser, Attorney General, Caitlin E. Grant, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Madeline Dobkin, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1    Defendant, James Petrie, appeals his convictions for possession with intent to manufacture or distribute a controlled substance — methamphetamine and possession with intent to manufacture or distribute a controlled substance — fentanyl.  We affirm.

## I.    Background

¶ 2    While conducting surveillance on a hotel in a high-crime area from his police vehicle, Officer Isaiah Acosta noticed a black Jeep Wrangler parked in the parking lot and saw a female enter on the passenger's side.  Acosta drove closer to the car and observed that Petrie, whom Acosta recognized from previous encounters and an arrest, was the driver.  Acosta knew, and quickly confirmed through a database search, that Petrie was subject to an active felony arrest warrant.  After confirming the active warrant, Acosta followed Petrie, who had started to drive away from the hotel parking lot.  Petrie failed to use a signal when turning, and Acosta pulled him over.  Before Petrie pulled over, Acosta saw him making "furtive movements" towards the car's rear passenger seat.  Acosta arrested Petrie and impounded the car.  Consistent with departmental policy, Acosta performed an inventory search and found a black

zippered bag under the passenger seat containing suspected narcotics, empty plastic bags, and a scale.

¶ 3 The prosecution initially charged Petrie with two counts of possession with intent to manufacture or distribute a controlled substance and one count of unlawful possession of a controlled substance. It endorsed Detective Geoffrey Coster as an expert on "drug enterprise and distribution." Coster testified that the evidence seized was consistent with drug sales and distribution. A jury found Petrie guilty of both counts of possession with intent to manufacture or distribute a controlled substance.

## II. Analysis

¶ 4 Petrie contends that (1) the trial court erred by denying his motion to suppress evidence; (2) Detective Coster's expert testimony violated CRE 702 and 704 and the trial court's pretrial rulings, and it invaded the province of the jury; (3) the prosecutor engaged in prosecutorial misconduct during rebuttal closing arguments; and (4) the cumulative effect of these errors deprived him of a fair trial. We disagree with each contention.

## A. Evidence Suppression

¶ 5 Petrie claims that (1) the trial court erred by denying his motion to suppress evidence; (2) Acosta's search, which did not produce an inventory list, only served pretextual investigatory purposes; and (3) the trial court erred by failing to, on its own motion, reconsider the suppression issue when Acosta's trial testimony conflicted with the court's pretrial findings. We are unpersuaded.

### 1. Additional Applicable Facts

¶ 6 Petrie moved to suppress the evidence found in his car, arguing that Acosta lacked probable cause to search the car, did not conduct a valid inventory search, and provided no inventory list during discovery.

¶ 7 At a pretrial hearing, Acosta testified that after pulling Petrie over, he approached Petrie's car to explain that he stopped Petrie because of Petrie's active arrest warrant. Acosta asked Petrie to exit the car and arrested him. Acosta also asked the female passenger to exit the car. Acosta testified that he was unable to "get a positive I.D." on her because she did not provide him with any identification and only gave him a name. Acosta ran the information the

passenger provided through a database, but he did not find a valid driver's license.

¶ 8     Acosta decided to impound Petrie's car because (1) it was parked illegally in a no-parking zone; (2) impounding ensured it would not be stolen or damaged, given the area's unsafe reputation; (3) Acosta could not entrust Petrie's car to the passenger without a valid driver's license and Petrie's approval; and (4) Acosta did not want to put Petrie in a situation where his car may not "be there or be intact" if Petrie didn't return within a reasonable amount of time to retrieve it given Petrie's $100,000 bond.

¶ 9     Consistent with the police department's standard procedure, Acosta said he conducted an inventory search of Petrie's car to ensure no items were "lost and/or stolen by [the] tow[ing] compan[y]."  During the search, Acosta found a black zippered case in the same area where he saw Petrie making "furtive movements." Acosta stated that he opened the case to make sure there weren't any expensive electronics to note down on the inventory list.  Inside, Acosta found "baggies containing crystal-like substance; a dark-tar like substance; [blue] pills, [] baggies, [and] a scale."  He did not find "anything else of note" in the car.  Acosta also found $1,040 in

4

Petrie's wallet, which Petrie claimed he withdrew from the bank to make his mortgage payment.

¶ 10     After the hearing, the court found the following:

- The People showed that the impoundment served an administrative caretaking function.

- The determination to impound the car comported with the government's standard criteria.

- The evidence showed that Petrie was in custody with a relatively high bond and would be unable to move the car.

- There was no indication that Petrie asked to contact anyone else who could pick up the car.

- The car was illegally parked in a high-crime area where there were multiple reports of stolen or trespassed cars and vandalism.

- Acosta testified that he opened the black zippered bag because there may have been a high-value item inside but instead found illegal substances and paraphernalia.

- Acosta testified that he did not find anything else of note in the car or anything that would be included in an inventory list.

- No tow sheet or inventory list was ever submitted to the court.

The court expressed concern that there was "no evidence that the officer conducted the inventory search in accordance with the government's policies" because "no written inventory list was provided," but it denied the motion to suppress and ultimately held that the inventory search was valid and served the required administrative caretaking function.

¶ 11 At trial, Acosta testified that in addition to the black zippered case, he saw "DVDs and some trash." During cross-examination, defense counsel asked Acosta whether he created an inventory list of everything else in the car and Acosta testified that he did. No inventory list was submitted to the trial court before or during trial. Petrie did not request a mistrial or ask the trial court to reconsider its suppression ruling.

## 2. Standard of Review and Applicable Law

¶ 12    Review of a district court's order regarding a defendant's motion to suppress involves a mixed factual and legal question. *People v. Allen*, 2019 CO 88, ¶ 13.  We defer to the court's factual findings if they are supported by competent evidence in the record, but we review de novo the court's application of the law to those facts.  *Id.*  We limit our review to the evidence presented at the suppression hearing.  *Moody v. People*, 159 P.3d 611, 614 (Colo. 2007).

¶ 13    The Fourth Amendment to the United States Constitution and article II of the Colorado Constitution prohibit unreasonable searches and seizures.  U.S. Const. amend. IV; Colo. Const. art. II, § 7.  When an officer obtains evidence in violation of the Fourth Amendment, "the exclusionary rule ordinarily bars the prosecution from introducing that evidence against the defendant in a criminal case."  *People v. Thomas*, 2021 COA 23, ¶ 12 (quoting *People v. Vaughn*, 2014 CO 71, ¶ 10).

¶ 14    A warrantless search is presumptively unreasonable unless the search falls within an exception to the warrant requirement. *Vaughn*, ¶ 14.  One such exception permits officers to conduct an

inventory search of a vehicle without a warrant based on probable cause when that vehicle is lawfully impounded by law enforcement officials. *Id.*

¶ 15 After impounding a vehicle, an officer may search the vehicle to inventory its contents, provided that the search conforms to standardized criteria limiting police discretion. *Colorado v. Bertine*, 479 U.S. 367, 372 (1987). Inventory searches "serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Id.* An inventory search conducted in accordance with an established, standardized policy is generally considered reasonable absent evidence that the officers conducted a search with impermissible motives such as "in bad faith or for the sole purpose of investigation." *Vaughn*, ¶ 14 (quoting *Pineda v. People*, 230 P.3d 1181, 1185 (Colo. 2010)).

¶ 16 The first question when analyzing the constitutionality of an officer's decision to impound a vehicle is whether standardized criteria authorized the impoundment. *Thomas*, ¶ 14. Even if a seizure complies with standardized criteria, the court must also ask "whether the impoundment and subsequent inventory serve an

administrative community caretaking function." *Id.* at ¶ 15

(quoting *People v. Brown*, 2018 CO 27, ¶ 12). Valid community

caretaking purposes may include the need to remove vehicles that

impede traffic or threaten public safety or convenience, and the

need to protect the vehicle and its contents against vandalism or

theft. *Id.*

### 3.    Analysis

¶ 17    Petrie does not challenge Acosta's decision to conduct a traffic

stop, arrest him, or impound his car. Rather, he contends that

Acosta's inventory search was purely pretextual, and the trial court

erred by denying his motion to suppress and by failing, on its own

motion, to reconsider its ruling.

¶ 18    We must first determine whether Acosta's decision to impound

the car satisfied a community caretaking function. *Thomas*, ¶ 15.

Although Petrie parked his car on a residential street when Acosta

stopped him, Petrie parked in a no-parking zone. The car was not

blocking traffic, but it was parked in a very narrow part of the

street, and Acosta feared it could be damaged by other vehicles if

drivers were not paying attention. Petrie's car was also parked in a

high-crime area, so there was a chance that his car might not be

there when he returned. Finally, Acosta testified that he could not release Petrie's car to anyone. We agree that Acosta's decision to impound the car served the community caretaking function.

¶ 19 Next, we address whether Acosta's inventory search was in bad faith or was pretextual. At the pretrial hearing, Acosta testified that when an officer impounds a car, the department's practice is to inventory the vehicle's contents (except items that would normally be considered part of or associated with the vehicle such as floor mats) to ensure the items in the car are accounted for so they're not lost or stolen by the towing companies.

¶ 20 While Acosta testified that the department's practice is to include a written inventory list with the tow sheet, nothing in the record indicates that one was completed. Acosta testified that the only items that would have been inventoried were the contents of the black zippered bag, which were removed for testing. Acosta testified that he did not find other notable items in the car that needed to be inventoried.

¶ 21 Because the only items Acosta found in the car that would have been included in the inventory list were properly removed for evidentiary purposes and Acosta's search was undertaken to

10

safeguard Petrie's property, we conclude the inventory search was not pretextual or conducted in bad faith.

¶ 22    Petrie's motion to suppress alleged that "there were multiple bags of items in the car[,] and they were not all searched.  Nor were they documented on an inventory form as required by police procedures."  But Petrie does not identify any evidence supporting this claim.  We conclude that the trial court did not err in denying Petrie's motion to suppress.  The search was not pretextual; rather, Acosta conducted the search in accordance with departmental procedures following a lawful impoundment.

¶ 23    Finally, Petrie contends that the trial court erred by failing to reconsider the suppression issue on its own motion because Acosta's trial testimony that he found "DVDs and trash" contradicts the testimony he gave at the suppression hearing — that, except for the black zippered bag, Acosta found nothing of note.  Petrie claims that the evidence should have been suppressed because the court's ruling was based on Acosta's prior testimony that no personal property was found in the car beyond the seized items and that the inconsistency should have prompted the court to reconsider its own ruling.  We disagree.

¶ 24    "[A] trial court ought to focus its inquiry only on the suppression hearing record, and not on the evidence and testimony subsequently presented at trial." *Moody*, 159 P.3d at 614.  We are similarly limited, as "an appeals court may only look to the suppression hearing in reviewing a lower court's ruling on such matters." *Id.*  It is "the defendant's obligation to ask the trial court to reconsider a pre-trial suppression ruling based on evidence subsequently adduced at trial." *People v. Martin*, 30 P.3d 758, 760 (Colo. App. 2000).  And, a trial court's failure to act on its own motion constitutes plain error only when the evidence presented at trial so clearly undermines the court's earlier ruling that the error should have been immediately apparent.  *Id.*

¶ 25    Petrie cites the trial court's observation during the suppression hearing that un-inventoried property could undermine the administrative caretaking function, but he does not argue that the un-inventoried items — specifically, the trash and DVDs — were so significant that the court should have reconsidered its ruling. For example, Petrie does not argue that Acosta's trial testimony would have changed the trial court's suppression ruling.

12

¶ 26    Accordingly, we conclude that Acosta's conflicting trial testimony does not create an error so obvious and substantial that it so undermined the trial's fundamental fairness as to cast serious doubt on the reliability of Petrie's conviction. *Hagos v. People*, 2012 CO 63, ¶ 14 (outlining the plain error standard).

## B.    Expert Testimony

¶ 27    Petrie argues that Coster's testimony violated CRE 702 and the trial court's pretrial rulings and invaded the province of the jury. We disagree.

### 1.    Additional Applicable Facts

¶ 28    The prosecution filed a notice to endorse Coster as an expert in drug enterprise and distribution. Coster provided an opinion letter indicating that the amount of methamphetamine in this case, which was more than ten grams, "exceeded personal use." Petrie filed a pretrial motion challenging Coster's proposed testimony and requested an evidentiary hearing to determine the admissibility of Coster's expert testimony under CRE 702 and 403. The trial court held an evidentiary hearing to address Coster's proposed testimony.

¶ 29    At the hearing, the court limited Coster's testimony to matters consistent with drug distribution as follows:

[A]ssuming that . . . the issue is primarily with respect to testimony that goes towards specific intent, obviously I think, and the prosecution agrees, that the expert would not be able to go towards specific intent, but could testify that the information is consistent with distribution. I think the same goes for if there was — if there was a presence of any baggies, they could say it was consistent with and not necessarily intent.

The court also noted that the parties could address the issue further on the morning of trial, but they did not.

¶ 30    At trial, Petrie did not object to Coster being qualified as an expert in drug enterprise and distribution.  During direct examination, Coster testified as follows:

Q. In your experience, would you generally expect someone who is just using to have empty or unused baggies in their possession?

A. No.  Usually, the individuals we find with personal use or users only, they will have empty baggies but they have residue in them. If they're clean, it's for repackaging and resale.

Q. Let's talk about the amount for methamphetamine.  I know this can probably vary.  Generally, what is a personal use amount or what would you consider a personal use amount?

A. The national standard that most investigators utilize at the state and federal level — a tenth of a gram is considered a

personal dose or one use.  You get ten uses out of one gram roughly.  That can vary based on the individual's tolerance to the drug.

Q. What about fentanyl?

A. That's a newer topic.  Currently, the DEA will get a lot of our education from [one] in [five] pills.  They consider it the kill pill. Usually for personal use that we see, truly if they're only using, they'll buy [three] to [five] pills at a time.

Q. Is it common for someone who is just using to carry more than that?

A. Not usually.  It's an addictive substance. Somebody that has larger amounts or quantities of any drug at that point can't help themselves if they had it in bulk.

Q. What about the presence of a scale?

A. That's indicative of distribution.  Rarely do you see users with a scale.

Q. Why?

A. Their stuff is prepackaged and comes to them.  Dealers don't like to short change their customers because it creates bad business.  At the end of the day, it's about the money. Usually, you only see scales at the dealer level.

Q. What about the presence of cash?

A. Cash is indicative of distribution, larger quantities obviously.  A lot of the true users scrape by with a lot of your other crimes

associated with drug use.  Your burglaries and thefts come[] from a user level.  They're trying to find enough money to get the next hit.

. . . .

Q. I want to have you look at all those items and can you tell me — considering all those items together, are those items consistent with distribution?

A. I would say yes.

Q. Why are they consistent with distribution?

A. Based on the totality of everything, you have higher quantities of multiple narcotics.  You have unused bags.  You have a digital scale to weigh.  Seeing all these things together means someone is distributing.

Defense counsel did not object to any part of Coster's testimony.

¶ 31     Petrie now contends that it was improper for Coster to testify that the evidence in this case "meant someone is distributing" because that was a question for the jury.  Petrie also claims that Coster's testimony with respect to the "baggies," the amount of fentanyl a user would possess, and the amount of a single use of methamphetamine being "a tenth of a gram" all violated the trial court's pretrial ruling limiting Coster's testimony.

16

## 2. Preservation

¶ 32    A pretrial motion may preserve an evidentiary objection for appellate review if the moving party fairly presents the issue to the court and the court issues a definitive ruling.  *See* CRE 103(a); *People v. Dinapoli*, 2015 COA 9, ¶ 20.  The principle that a definitive pretrial ruling preserves an evidentiary issue for appeal is intuitive when the parties follow the court's pretrial order; but when a party violates the court's pretrial order, common sense militates in favor of requiring a contemporaneous objection.  *Dinapoli*, ¶¶ 21-22.  Such an objection alerts the trial court to both the violation of the pretrial order and to the objecting party's argument against the other party's action.  *Martinez v. People*, 244 P.3d 135, 139-40 (Colo. 2010).  Accordingly, "when an opponent acts contrary to a pretrial order, a party must contemporaneously object to preserve an appellate argument that the court should have prohibited the action." *Dinapoli*, ¶ 24.

¶ 33    That did not happen here.  During trial, Petrie's counsel had the opportunity to object to Coster's qualification as an expert but declined to do so.  Likewise, Petrie's counsel failed to object to Coster's testimony concerning narcotics repackaging and resale, the

national standard for a single use of methamphetamine, and the personal use amount for fentanyl. Because counsel failed to object, Petrie's claims are unpreserved.

### 3. Standard of Review and Applicable Law

¶ 34     We review unpreserved claims for plain error. *People v. Miller*, 113 P.3d 743, 748-50 (Colo. 2005). Under this standard, reversal is required if an error was "obvious and substantial." *Hagos*, ¶ 14. An error is obvious if it is so clear that a trial judge should have been able to avoid it without benefit of objection. *People v. Pollard*, 2013 COA 31M, ¶ 39. Generally, an error is obvious when the action challenged on appeal contravenes (1) a clear statutory command; (2) a well-settled legal principle; or (3) Colorado case law. *Dinapoli*, ¶ 30. An error is "substantial" if it so undermined the trial's fundamental fairness as to cast serious doubt on the reliability of the defendant's conviction. *Hagos*, ¶ 14. A reviewing court "must evaluate [an error] in light of the entire record below" to determine its effect on the verdict and the trial. *People v. Eppens*, 979 P.2d 14, 18 (Colo. 1999).

¶ 35     CRE 702 and 403 govern the admissibility of expert testimony. *Kutzly v. People*, 2019 CO 55, ¶ 10. A witness may offer expert

testimony if the witness has "scientific, technical, or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue" and the witness is "qualified as an expert" based on "knowledge, skill, experience, training, or education." CRE 702.

¶ 36 The expert testimony must be reliable and relevant, and its probative value must not be substantially outweighed by any of the countervailing considerations listed in CRE 403. Under CRE 403, "relevant[] evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

¶ 37 An expert witness can't tell the jury which result to reach or usurp the jury's factfinding role, but "[t]estimony in the form of an opinion or inference" isn't objectionable merely "because it embraces an ultimate issue to be decided by the [fact finder]." CRE 704; *People v. Baker*, 2019 COA 165, ¶ 14, *aff'd*, 2021 CO 29. When determining whether the expert testimony usurped the jury's role as a fact finder, courts consider several factors, including, but

not limited to, whether (1) the testimony was clarified on cross-examination; (2) the expert's testimony expressed an opinion of applicable law or legal standards, thereby usurping the court's function; (3) a jury was properly instructed on the law and that it was free to accept or reject the expert's opinion; and (4) the expert opined that the defendant committed the crime or there was a particular likelihood that the defendant committed the crime. *People v. Rector*, 248 P.3d 1196, 1203 (Colo. 2011).

### 4.   Analysis

¶ 38     Petrie contends that it was improper for Coster to testify that (1) the totality of evidence in this case meant "someone was distributing" because such testimony usurped the jury's role under CRE 704; (2) the "baggies" were for repackaging and resale and the cash and scale were indicative of an intent to distribute; and (3) the "national standard" for methamphetamine and the DEA's "personal use" standard for fentanyl were unreliable and misled the jury.  We disagree with each contention.

¶ 39     First, Coster's testimony did not usurp the jury's role.  Coster did not testify that Petrie had the *intent* to distribute narcotics, which was the limitation the court imposed on Coster's testimony at

the pretrial hearing. Rather, Coster testified that the evidence seized from Petrie's car was *consistent with distribution.* This is exactly the type of testimony that he was endorsed to provide as an expert in drug distribution. Further, Coster did not opine that Petrie committed the charged crimes — possession with intent to manufacture or distribute controlled substances — or that there was a likelihood that he committed the charged crimes. The jury was able to draw its own conclusion about Petrie's intent.

¶ 40 Likewise, defense counsel was able to cross-examine Coster. Rather than challenging Coster's direct testimony or asking clarifying questions, however, defense counsel focused on Coster's decision not to request DNA testing on the seized evidence or to obtain a warrant to search Petrie's phone.

¶ 41 Additionally, the court instructed the jury that it was

> not bound by the testimony of a witness who has testified as an expert; the credibility of an expert's testimony is to be considered as that of any other witness. [It] may believe all of an expert's testimony, part of it, or none of it.

Because Petrie had the opportunity to cross-examine Coster, Coster did not opine that Petrie committed — or likely committed — the crimes charged, and the court instructed the jury that it did not

have to believe Coster's testimony, Coster's testimony did not usurp the jury's role.

¶ 42     Second, Coster's testimony concerning "baggies," large amounts of cash, and a scale did not demonstrate that Petrie had an *intent* to distribute controlled substances.  Rather, Coster's testimony concerning these items was specialized knowledge that would help the jury understand the significance of what had been seized and ultimately determine whether Petrie had the requisite intent to distribute controlled substances.

¶ 43     Third, Petrie's argument that Coster's testimony relating to the standards constituting "personal use" of narcotics was unreliable is misplaced.  Petrie's concern with Coster's "personal use" testimony doesn't touch on the evidence's *admissibility*; instead, it relates to "the reliability of scientific principles go[ing] to the weight of the evidence."  *People v. Campbell*, 2018 COA 5, ¶ 42.  Such concern is "adequately addressed by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."  *Id.* (citation omitted); *see also* CRE 705 ("The expert may in any event be required to disclose the underlying facts or data on cross-examination.").  Petrie elected not to cross-examine Coster on

22

the data concerning personal use.  Similarly, Petrie did not present evidence challenging the national standard for methamphetamine or the DEA's standard on fentanyl.

¶ 44 Accordingly, we perceive no error with the court's decision permitting Coster to testify on matters relating to drug distribution. Even if Coster's testimony was erroneously admitted under CRE 702 or 704, any error was not obvious or substantial.  The testimony did not contravene a statutory command, a well-settled legal principle, or case law, nor did it so undermine the trial's fundamental fairness as to cast serious doubt on the reliability of Petrie's convictions.

## C.     Prosecutorial Misconduct

¶ 45 Petrie contends that the prosecutor's comments during the rebuttal phase of closing arguments violated his right to a fair trial and require reversal.  We disagree.

### 1.     Applicable Law and Standard of Review

¶ 46 Our review of a prosecutorial misconduct claim involves a two-step analysis.  First, we determine whether the prosecutor's conduct was improper based on the totality of the circumstances; second, if so, we determine whether the conduct warrants reversal

under the proper standard of review. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).

¶ 47    Closing argument must be confined to the evidence admitted at trial, the inferences that can reasonably and fairly be drawn from it, and the instructions of law submitted to the jury. *People v. Rojas*, 181 P.3d 1216, 1223 (Colo. App. 2008). A prosecutor may not misstate the evidence, use arguments calculated to inflame the passions and prejudices of the jury, denigrate defense counsel, or assert a personal opinion as to the defendant's guilt or the witnesses' credibility. *People v. Gladney*, 250 P.3d 762, 769 (Colo. App. 2010).

¶ 48    We evaluate claims of improper argument in the context of the argument as a whole and by considering the evidence before the jury. *People v. Conyac*, 2014 COA 8M, ¶ 132. During closing arguments, "prosecutors have wide latitude in the language and style they choose to employ." *People v. Duncan*, 2023 COA 122, ¶ 31 (quoting *People v. McMinn*, 2013 COA 94, ¶ 60). Additionally, "because arguments delivered in the heat of trial are not always perfectly scripted, reviewing courts accord prosecutors the benefit of

the doubt when their remarks are ambiguous or simply inartful."
*People v. Samson*, 2012 COA 167, ¶ 30.

¶ 49     To determine whether a closing argument was improper, we
consider the language used, the statements' context, the strength of
the evidence, and whether the prosecutor repeated the misconduct.
*People v. Lovato*, 2014 COA 113, ¶ 64.  Defense counsel's failure to
object is also a factor that we may consider, as it may "demonstrate
defense counsel's belief that the live argument, despite its
appearance in a cold record, was not overly damaging."  *Id.* at ¶ 65
(quoting *People v. Wallace*, 97 P.3d 262, 269 (Colo. App. 2004)).

¶ 50     If defense counsel objected at trial, we review prosecutorial
misconduct under the harmless error standard.  *Wend*, 235 P.3d at
1097.  If there was no contemporaneous objection to the statement,
a plain error standard of review applies.  *Id.*  Petrie did not object to
the prosecutor's closing statements, so we review for plain error.

### 2.     Analysis

¶ 51     Petrie contends that during the rebuttal phase of closing
arguments, the prosecutor made repetitive comments about Petrie's
constitutional rights, denigrated the defense, used inflammatory
remarks that appealed to the jury's passions and community

values, expressed personal opinions on Petrie's guilt, and misstated the reasonable doubt standard. While we acknowledge that some of the challenged statements were inartful, none rise to the level of misconduct.

¶ 52    First, Petrie claims that the prosecutor improperly commented on his constitutional rights. He argues that even though probable cause and warrants were not at issue, the prosecutor implicated the Fourth Amendment by stating that

> [t]he defendant has rights to searches and seizures. You can't just take someone's phone and search it for the same reason we can't just walk through his front door. You need a warrant. To get a warrant, you need probable cause that that item contains evidence of a crime, not that it's on a criminal, not that somebody's dealing drugs and it could contain correspondence or text messages about selling drugs. It has evidence of a crime on it. The defense knows this. We know this. The defense is hoping you don't. What do they do? They ask the questions about why didn't we search his phone to try to get the [thirteen] of you [jurors] to think, why didn't they? The defendant has rights.

According to Petrie, this argument was impermissible because the prosecutor speculated that Petrie wouldn't have consented to a search of his phone and the jury could infer that Petrie had

something to hide. Similarly, Petrie claims that the prosecution's comments on Petrie's "compulsion to explain where the money came from" improperly touched on his Fifth Amendment rights:

> Acosta knows the defendant has rights under *Miranda.* He has Fifth Amendment rights. He can't ask him any questions unless Mr. Petrie waives that privilege. Deputy Acosta knows he can't ask any questions.

Petrie claims that the prosecutor insinuated Petrie exercised his right to remain silent and refused to waive his *Miranda* rights.

¶ 53 We disagree with Petrie's contention that these statements prejudiced his Fourth or Fifth Amendment rights. The prosecutor was responding to the defense's closing argument that the People's investigation was inadequate because they did not bother to search Petrie's phone for evidence of drug distribution. The prosecutor never speculated that Petrie would not consent to a search of his phone, he simply explained that to search a person's phone, "you would need a warrant" and to obtain a warrant, "you need probable cause that the item contains evidence of a crime." Likewise, the prosecution mentioned the Fifth Amendment to explain why Acosta did not ask Petrie follow-up questions after Petrie indicated that the money was to pay his mortgage.

¶ 54    Next, Petrie argues that the prosecutor denigrated defense counsel and the defense's theory of the case when the prosecutor made the following statements:

> [Defense counsel] said if you're going back and deliberating and you have a hesitation, that means you have to find the defendant not guilty. That's not true. That's not how the criminal justice system works. You're meant to go back there and have a fair and rational consideration of all of the evidence. Determine if there's a reasonable doubt. There's going to be hesitations. You're going to have conversations or arguments. What we're talking about is it's [the prosecution's] burden to prove each of the elements of both charges beyond a reasonable doubt.
>
> . . . .
>
> What is a reasonable objective analysis? There's no lawyer tricks or skirting the evidence to color it in a certain way. . . . We know the defendant knew the drugs were there.

According to Petrie, such statements framed defense counsel as "deceptive, unethical, and manipulative" and were designed to "incite bias in reasonable jurors." We aren't persuaded.

¶ 55    Upon review of the trial transcript, the prosecutor was responding to defense counsel's discussion on reasonable doubt and her comment that if any juror had "one hesitation, just one,

you need to find Mr. Petrie not guilty." The prosecutor simply questioned the defense's theory, which was that Petrie did not know the drugs were there because they belonged to the passenger. Prosecutors may "suggest to the jury that [the] defendant's theory . . . was so unlikely as to strain credibility." *People v. Collins*, 250 P.3d 668, 678 (Colo. App. 2010). We perceive no misconduct with the prosecution's discussion of the defense's theory during closing arguments.

¶ 56    Petrie also claims that the prosecutor engaged in misconduct when he made the following statements which served no purpose but to inflame the jury's passions and prejudices:

> If all that was done and every resource was put towards this case and we ignored all the murders and the rapes and we told [Colorado Bureau of Investigation] to take their analysts, where they had less than ten, to help with the state of Colorado and focus on this case and the defendant's DNA shows up on those drugs, okay.

The prosecutor's comments responded to defense counsel's criticism of the investigation, which lacked DNA analysis and fingerprint evidence. While the prosecutor's statements were inartful, they weren't improper.

¶ 57    Next, Petrie contends that the prosecutor's statement, "We have the right guy.  He's guilty," undermined Petrie's right to an impartial jury and the presumption of innocence.  While questionable, the statement was not an expression of the prosecutor's personal beliefs of Petrie's guilt.  *See People v. Mason,* 643 P.2d 745, 752 (Colo. 1982) (prosecutors may not express personal beliefs as to a defendant's guilt).  Rather, the statement was made in response to defense counsel's closing statement that the government failed to adequately do its job and the suggestion that had more resources been allocated to the case, the government may have been wrong.  The statement did not (1) convey the impression that the prosecutor knew of evidence, not presented to the jury, supporting the charges against Petrie; or (2) induce the jury to trust the prosecutor's judgment rather than its own view of the evidence.  *See People v. Herold,* 2024 COA 53, ¶ 89 (listing dangers posed by a prosecutor's expression of personal belief).

¶ 58    Finally, Petrie contends that the prosecution improperly misstated the law when addressing reasonable doubt.  We are similarly unpersuaded.  The prosecution's discussion of reasonable doubt appropriately responded to the defense's closing argument

that explained the high standard of reasonable doubt and Petrie's presumption of innocence. The prosecutor's rebuttal closing arguments focused on the government's burden of proof and the deliberations the jury would engage in before reaching a decision. Further, the prosecution's rebuttal mirrored the defense's own language of having "one hesitation"; therefore, we discern no misconduct. *See People v. Ray*, 2025 CO 42M, ¶ 150 (concluding that the prosecution's comments weren't improper when they mirrored defense counsel's own words and were in response to defense counsel's argument). Finally, the court provided its own instruction defining reasonable doubt as

> a doubt based upon reason and common sense
> which arises from a fair and rational
> consideration of all of the evidence, or the lack
> of evidence, in the case. It is a doubt which is
> not vague, speculative or imaginary doubt, but
> such a doubt as would cause reasonable
> people to hesitate to act in matters of
> importance to themselves.

Thus, even if the jury had any lingering prejudice, it was cured by the court's instruction. *See People v. Meils*, 2019 COA 180, ¶ 24 (Generally, "a curative instruction will remedy any prejudice caused by an improper argument.").

31

### D. Cumulative Error

¶ 59 Petrie argues that the cumulative effect of the errors throughout his case deprived him of a fair trial. We disagree and decline to conduct a cumulative error analysis because we conclude that the trial court did not commit any of the errors Petrie asserted. *See Conyac*, ¶ 152 ("The doctrine of cumulative error requires that numerous errors be committed, not merely alleged.").

### III. Disposition

¶ 60 The judgment of conviction is affirmed.

JUDGE FOX and JUDGE HAWTHORNE concur.